# U.S. EX REL. [SEALED] V. [SEALED]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUN 28 2018

JAMES N. HATTEN, Clerk
By: ⟨signature⟩ Deputy Clerk

|  |  |
|---|---|
| UNITED STATES OF AMERICA; | ) |
| the States of ARKANSAS, CALIFORNIA, | ) |
| COLORADO, CONNECTICUT, | ) |
| DELAWARE, FLORIDA, GEORGIA, | ) |
| HAWAII, ILLINOIS, INDIANA, IOWA | ) |
| LOUISIANA, MARYLAND, | ) |
| MASSACHUSETTS, MICHIGAN, | ) |
| MINNESOTA, MISSOURI, MONTANA, | ) |
| NEVADA, NEW HAMPSHIRE, NEW | ) |
| JERSEY,NEW MEXICO, NEW YORK, | ) |
| NORTH CAROLINA, OKLAHOMA, | ) |
| RHODE ISLAND, TENNESSEE, TEXAS, | ) |
| VERMONT, VIRGINIA, WASHINGTON, | ) |
| WISCONSIN, and THE DISTRICT OF | ) |
| COLUMBIA, ex rel. | ) |
| KRYSTA MANGRUM, | ) |
|  | ) |
| Plaintiffs-Relator, | ) |
|  | ) |
| v. | ) |
|  | ) |
| LABORATORY CORPORATION OF | ) |
| AMERICA HOLDINGS (LABCORP), | ) |
| NORTH GEORGIA HEALTHCARE | ) |
| CENTER (NGHCC), NGHCC CHIEF | ) |
| EXECUTIVE OFFICER DELAINE | ) |
| HUNTER, and NGHCC MEDICAL | ) |
| DIRECTOR DR. GARY SMITH, | ) |
|  | ) |
| Defendants. | ) |

Civil Action No. **1 18-CV-3121**

**FILED IN CAMERA AND UNDER SEAL**

Jury Trial Requested

## COMPLAINT

I.      STATEMENT OF THE CASE ....................................................... 1
II.     LEGAL FRAMEWORK ............................................................. 11
    A.  Parties ..................................................................................... 11
    B.  Jurisdiction and Venue ........................................................... 14
    C.  The Applicable Laws, Which Have Been Violated .................... 15
        1.  The Federal False Claims Act ............................................ 15
        2.  The Anti-Kickback Statute ................................................ 17
        3.  The State False Claims Acts .............................................. 19
        4.  The California and Illinois Insurance Fraud Prevention Acts ......... 19
III.    THE REGULATORY FRAMEWORK ........................................ 23
    A.  The Federal-State Health Care Programs ................................. 23
        1.  Medicare ........................................................................... 23
        2.  Medicaid Federal-State Health Care Program .................... 25
        3.  The TRICARE Program ...................................................... 26
        4.  The Federal Employee Health Benefits Program ............... 26
        5.  The U.S. Department of Veterans Affairs .......................... 27
        6.  The Consolidated Health Center Program .......................... 27
    B.  The Classification of Certain Dangerous and Addictive Drugs by the U.S. Drug Enforcement Administration (DEA) ................................. 27
IV.     FRAUDULENT SCHEME ......................................................... 29
    A.  LabCorp Unlawfully Induced Referrals for Unnecessary, Excessive and Ineffective Drug Testing Through Discounted Lab Rates, Placing Staff In-House, and Providing Specimen Collection Supplies ............................... 29
        1.  Defendants Well Know the Drug Testing Requirements are Material to Payment ............................................................. 30
        2.  LabCorp's Kickbacks to NGHCC Led to Excessive Billing for Unnecessary and Worthless Drug Testing ....................... 36
        3.  Nationwide Data Corroborates the Relator's LabCorp Allegations 46
        4.  Examples of False or Fraudulent Claims Submitted by LabCorp ... 50
            i.   Patient 1 ..................................................................... 51
            ii.  Patient 3 ..................................................................... 54
            iii. Patient 7 ..................................................................... 57

iv.  Patient 8 ..................................................................................... 60

B.  NGHCC Executed Sham Partnerships with Specialty Providers to Obtain Federal FQHC Grant Money that was Used to Facilitate a Kickback Scheme ........................................................................................... 62

1.  NGHCC's Participation in the FQHC Program ............................. 63

2.  NGHCC Had Sham Partnerships with Specialty Providers ........... 65

C.  Defendants Fraudulently Billed for Unqualified and Uncredentialed NGHCC Staff Who Failed to Provide Patients with Serious Medical Conditions the Treatment They Needed. ................................................... 70

1.  Medical Director Dr. Smith's Provider Number was Fraudulently Used for Billing ........................................................................... 75

2.  Examples of Unqualified and Uncredentialed Providers Treating Patients and Fraudulently Billing the Federal Health Care Programs ..................................................................................................... 78

i.  Staff Person C ............................................................................. 79

a)  Patient 9 ................................................................................ 80

b)  Patient 10 .............................................................................. 81

ii.  Staff Person E ............................................................................. 81

a)  Patient 11 .............................................................................. 83

b)  Patient 12 .............................................................................. 83

iii.  Staff Person F ............................................................................ 84

a)  Patient 13 .............................................................................. 84

b)  Patient 14 .............................................................................. 85

D.  Defendants Knowingly Failed to Properly Treat Patients Suffering from Opioid Abuse and Overprescribed Dangerous Drugs to its Patients, Resulting in Patient Harm and Even Patient Deaths .................................. 86

E.  Defendants Falsified and Forged Medical Records to Hide the Alleged Practices from the Regulators, and Knowingly Failed to Maintain Accurate Medical Records ......................................................................... 93

F.  Defendants Knew that Compliance with the Relevant Laws Was Material to the Government's Decision to Pay Because They Went to the Essence of the Government's Bargain for Which it was Paying ............................. 98

V.  DEFENDANTS UNLAWFULLY RETALIATED AGAINST RELATOR .................................................................................................... 102

COUNT I...................................................................................................... 106

COUNT II .................................................................................................... 107

COUNT III................................................................................................... 108

COUNT IV................................................................................................... 110

COUNT V .................................................................................................... 111

COUNT VI................................................................................................... 112

COUNT VII ................................................................................................. 114

COUNT VIII................................................................................................ 116

COUNT IX................................................................................................... 117

COUNT X .................................................................................................... 119

COUNT XI................................................................................................... 121

COUNT XII ................................................................................................. 122

COUNT XIII................................................................................................ 124

COUNT XIV................................................................................................ 126

COUNT XV ................................................................................................. 127

COUNT XVI................................................................................................ 129

COUNT XVII ............................................................................................. 130

COUNT XVIII ............................................................................................ 132

COUNT XIX................................................................................................ 134

COUNT XX ................................................................................................. 136

COUNT XXI................................................................................................ 137

COUNT XXII .............................................................................................. 139

COUNT XXIII ............................................................................................ 141

COUNT XXIV............................................................................................. 143

COUNT XXV .............................................................................................. 144

COUNT XXVI............................................................................................. 146

COUNT XXVII............................................................................................ 147

COUNT XXVIII .......................................................................................... 149

COUNT XXIX............................................................................................. 150

COUNT XXX .............................................................................................. 151

III

COUNT XXXI ............................................................................................. 153

COUNT XXXII ............................................................................................ 154

COUNT XXXIII ........................................................................................... 155

COUNT XXIV .............................................................................................. 156

COUNT XXV ............................................................................................... 158

COUNT XXVI .............................................................................................. 160

COUNT XXXVII .......................................................................................... 161

COUNT XXXVIII ........................................................................................ 162

COUNT XXXIX ........................................................................................... 164

COUNT XL .................................................................................................. 168

COUNT XLI ................................................................................................. 170

This is a *qui tam* action by Plaintiff-Relator Krysta Mangrum to recover treble damages and civil penalties arising from the actions of Defendants Laboratory Corporation of America Holdings ("LabCorp"), North Georgia Healthcare Center ("NGHCC"), NGHCC Chief Executive Officer Delaine Hunter, and NGHCC Medical Director Dr. Gary Smith (collectively, "Defendants").

The allegations in this case squarely represent:

- One of the root causes of the opioid epidemic—the over-prescribing of addictive opiates, resulting in patient harm and patient deaths, and

- the exploitation of the opioid crisis motivated by financial greed.

The laws that were violated include the Federal False Claims Act, the various state False Claims Acts, the Federal Anti-Kickback Statute, and the California and Illinois Insurance Fraud Prevention Acts.

## I.   STATEMENT OF THE CASE

1.   The Justice Department has described the opioid epidemic as the deadliest drug crisis in American history.

2.   Attorney General Jeff Sessions has vowed "*to help combat the devastating opioid crisis that is ravaging families and communities across America.*"

1

3.     In requesting an over $28 billion budget for 2019, the Attorney General emphasized that "…*we are experiencing overdose death rates like we have never seen in this country. [] It must end.  We are out of time — we have to see results now.*" (Jeff Sessions testimony before the Senate Subcommittee on Commerce, Justice, Science, and Related Agencies, April 25, 2018).

4.     The allegations in this case are ones that the Justice Department has identified as an enforcement priority.

5.     In remarks by Justice Department Opioid Coordinator Mary Daly, as recently as June 26, 2018, she said: "*As President Trump declared a public health emergency and made fighting the drug epidemic a top priority of his Administration. And Attorney General Sessions has heeded this call.  Under the Attorney General's leadership, the Department will do everything we can to reduce the number of drug overdose deaths—and we will succeed with your help.  Our national strategy to combat the drug epidemic centers on three pillars—prevention, enforcement, and treatment. Each of our districts faces a unique drug threat.  That's why each of our U.S. Attorneys has designated an opioid coordinator to implement a strategy to address the threat in that particular region. The drug crisis is a complex problem, and one that demands thoughtful solutions.  We are committed to tackling all aspects of this crisis, from the over-prescription and unlawful diversion of pharmaceutical*

2

*drugs, to the trafficking of traditional street drugs, to the proliferation of illicit drug sales online."* https://www.justice.gov/opa/speech/justice-department-opioid-coordinator-mary-daly-delivers-remarks-indian-country-drug

6.     The case also represents the very type of health care fraud the states of California and Illinois sought to address when they enacted laws to protect private health insurance policyholders.  As stated by the California legislature: *"Health insurance fraud is a particular problem for health insurance policyholders. Although there are no precise figures, it is believed that fraudulent activities account for billions of dollars annually in added health care costs nationally.  Health care fraud causes losses in premium dollars and increases health care costs unnecessarily*."

7.     Further, the California Department of Public Health has made opioid abuse a health care fraud priority to tackle.  In June 2016, it issued a report on its "Strategies to Address Prescription Drug (Opioid) Misuse, Abuse, and Overdose Epidemic in California."

8.     This case has layers of opioid-related wrongful conduct—from perpetuating opioid addiction to exploiting the opioid crisis for financial gain, at the expense of the taxpayers.

3

9.     Broadly speaking, the alleged conduct involves a drug testing laboratory, exploiting the Government's efforts to attack the opioid crisis, by providing unlawful financial inducements to providers like NGHCC for unnecessary drug testing, and a provider with unqualified staff that knowingly perpetuated and worsened patients' opioid addiction rather than providing needed medical care to patients with serious medical conditions.

10.    Defendant LabCorp knowingly provided unlawful kickbacks as inducements to health care providers like Defendant NGHCC to routinely bill for excessive urine/blood drug tests that were never ordered by a physician, were medically unnecessary, and which Defendants knew were not being used to diagnose and treat patients' opioid addictions.   NGHCC, along with its Chief Executive Officer (Delaine Hunter) and Medical Director (Dr. Smith) knowingly billed government and private-insured federal and state health care programs for inadequate or worthless health care services, or services that were not ordered by a physician, on behalf of patients with serious health conditions, including addictions.

11.    **LabCorp**—As LabCorp well knew, Medicare only covers tests that are reasonable and necessary for the treatment or diagnosis of an individual patient's illness or injury, based on the patient's medical condition.   42 U.S.C. § 1395y(a)(1)(A).   The need for each test must be individually assessed and

4

documented in the patient's medical chart.  42 C.F.R. §§ 410.32(a), (d)(2).  Even patients with serious medical conditions, including chronic pain and opioid addiction, must have demonstrated need for urine and blood tests.  Federal, state and private insurance coverage is for tests that are reasonable and necessary.

12.    LabCorp encouraged and induced providers like NGHCC to order blood/urine tests as a matter of course because it was profitable for the company.  Of course, the excessive spending for unnecessary tests was borne by the federal and state health care programs and the private insurers in California and Illinois.   And, unfortunately, the excessive testing was counter-productive and led to patients with addictions and need for medical attention to be overlooked and ignored.

13.    LabCorp employed the use of standard protocols to repeatedly test for: (1) panels of opioids and opioid-like drugs when there was no documented history of the patient taking those drugs ("initial drug screens or drug panels"), (2) drugs that were already known to be in the patient's system because they were medications prescribed by the provider and other common over-the-counter ("OTC") medications ("expected" drug results), and (3) the amount of known or expected drugs in patients' blood or urine ("confirmatory" drug tests).  These tests were useless for diagnosis and treatment planning because (a) there was no documented reason in the patients' medical records for the excessive numbers of tests, (b) these

5

tests provided expected results, and/or (c) these tests were not reviewed or used for diagnosis or treatment planning for patients with drug addiction, even when they should have been; by flooding the provider with laboratory test results performed as a matter of course, the result was that Defendants overlooked test results that demonstrated drug addiction and should have been used for the treatment of substance abuse. However, these drugs tests did provide a significant billing opportunity for LabCorp.

14.    As one example, LabCorp often excessively billed for a panel of opioid-based drugs for a single patient that could include as many as 10 or more billed procedure codes (i.e., a standard 10 panel drug urine test typically looks for cocaine, marijuana, PCP, amphetamines, opiates, benzodiazepines, barbiturates, methadone, propoxyphene, & Quaaludes). The lab company tested and billed without regard to medical necessity for the tests and as often as every 1 to 3 months even with no documented history of opioid abuse by the patient. LabCorp was fraudulently cashing in on the Government's (and private insurers') heightened concern caused by the opioid crisis by billing for excessive and unnecessary tests for drugs like heroin, methadone, and other DEA Schedule I and II drugs, even when there was no indication in the medical record that the patient was using these narcotics, let alone abusing them.

15.    As another example, when testing a patient for the presence of opioid-based drugs, LabCorp unnecessarily tested and billed for the presence of even commonly used over-the-counter drugs like Tylenol.

16.    LabCorp also unnecessarily performed and billed for "confirmatory" drug tests, i.e., a drug test that requires a physician order to confirm the amount of a single drug in a patient's system.  Confirmatory drug tests are costly for insurers. For example, Medicare reimburses between $100-$250 for each confirmatory drug test.  LabCorp improperly performed confirmatory tests, often without the required doctor's order, and excessively billed the health care programs for these tests. Billing for these tests amounted to false or fraudulent claims because an order from a doctor was required.  Further, as shown by what happened at NGHCC, the provider was unable to make effective use of the confirmatory test for patient diagnoses and treatment plans because LabCorp was confirming quantitative amounts of drugs that the provider knew the patient was taking (unnecessary tests) and inundating the provider with confirmatory test results (excessive tests).

17.    LabCorp exploited the Government's and private insurer's heightened sensitivity toward opioid abuse by inducing practices like NGHCC to order excessive, unnecessary, worthless, ineffective, and costly urine and blood drug tests

7

in exchange for discounted services and other financial benefits, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

18.    LabCorp ensured that providers ordered medically unnecessary lab tests by offering them inducements to routinely order tests—as a matter of protocol—for patients without regard to individual patient assessment or need.

19.    This type of financial exploitation is a predictable consequence of the opioid crisis and the federal and state False Claims Acts are the appropriate enforcement tools to address such conduct when it becomes fraudulent.  In 2014, The Wall Street Journal reported that Medicare spent $445 million on 22 laboratory drug tests for opioids (or other drugs subject to abuse) in 2012 alone, representing a more than 1,000 percent increase from prior years.  Yet, with all the increased government and private insurer money used for testing, the crisis has worsened.  In 2015, another one of the largest urine drug testing laboratories in the country, Millennium Health, was caught violating the False Claims Act by excessive and medically unnecessary urine drug testing.

20.    **NGHCC**—NGHCC operates as a Federally Qualified Healthcare Center (FQHC), which is a community-based health care provider with oversight from the Health Resources & Services Administration (HRSA) Health Center Program to provide primary care services in underserved areas.  NGHCC's patient

8

population suffers from debilitating diagnoses, among them chronic pain, drug addiction, and depression. So, in addition to submitting claims to the health care programs for medical services, NGHCC also received support from various federal agencies as a FQHC.

21.    As an FQHC, CEO Hunter fraudulently certified compliance with HRSA government-mandated requirements to be eligible for special benefits and funding, in addition to government-insured reimbursement for claims.

22.    NGHCC did not meet many or most requirements that were material to the Government's decision to pay the claims for primary care services or to provide FQHC funding.

23.    CEO Delaine Hunter also fraudulently certified NGHCC's compliance with certain requirements to receive millions of dollars in funding, in addition to FQHC privileges.

24.    To obtain federal grant money, NGHCC executed sham partnerships with specialty providers (i.e., behavioral health, dental, physical therapy, and other service providers) and used the funds to facilitate a kickback scheme. Yet, these specialty services were not actually provided to patients.

25.    NGHCC, under the direction and supervision of CEO Delaine Hunter and Medical Director Dr. Smith, knowingly allowed government and private-insured

health care services to be provided by uncredentialed and unqualified staff to the detriment of patients' well-being; and these services were billed for and paid by the federal, state, and private payor health care programs.

26.     To compound this practice of using uncredentialed and unqualified medical staff to evaluate patients and prescribe (or overlook) treatment plans, Defendants caused or perpetuated patients' opioid addictions.  Medical Director Smith was the only credentialed physician at NGHCC.  Yet, it is not in dispute that he appeared at the facility no more than a single day each week, and sometimes less. Despite the regular absence of the one credentialed physician at the facility, Dr. Smith routinely signed (or had other staff sign on his behalf) stacks of prescriptions (including opioids) for patients whom he never laid eyes on, and NGHCC routinely submitted claims to the government and private-insured health care programs on behalf of 60-80 patients daily whom he never saw.

27.     Notably, the U.S. Department of Health and Human Services Office of the Inspector General (HHS-OIG) highlighted the seriousness of these violations.  In a May 2018 report, HHS-OIG found that a troubling area of Medicaid noncompliance was improper payments for services rendered by providers who were not properly enrolled or credentialed in the government-insured health care programs.  *See* U.S. HHS-OIG Report, "U.S. Department of Health and Human

10

Services Met Many Requirements of the Improper Payment Information Act of 2002, But Did Not Fully Comply for Fiscal Year 2017," (May 2018)

28.    In summary, through this fraudulent course of conduct, Defendants knowingly submitted (or caused the submission of) thousands of false or fraudulent claims, or knowingly received grant funds they were not entitled to, in violation of the Federal and state False Claims Acts, the Anti-Kickback statute, and in violation of the private insurer False Claims Acts' qui tam provisions of the states of California and Illinois.

29.    On information and belief, the alleged conduct has been occurring since at least as early as 2009 when Dr. Smith joined NGHCC.

## II.   **LEGAL FRAMEWORK**

### A.    **Parties**

30.    Relator alleges, based upon her personal knowledge, and relevant documents and information, and on information and belief, the facts set forth in this Complaint.

31.    Relator Krysta Mangrum was the lead billing specialist at NGHCC from July 2016 through May 2018 and was the person who was primarily responsible for submitting NGHCC's claims to health insurance providers, including the government-insured programs.  Relator has considerable experience

11

in Medicare and Medicaid billing.  Relator left NGHCC because she was retaliated against for raising, objecting to, and opposing the fraudulent conduct alleged in this Complaint.

32.    Relator has standing to bring this action pursuant to 31 U.S.C. § 3730(b)(1). Relator is the original source of her allegations as defined in 31 U.S.C. § 3730(e)(4)(B).   Prior to becoming aware of any known public disclosure under subsection (e)(4)(A) of 31 U.S.C. § 3730, Relator voluntarily disclosed to the Government the information on which the allegations or transactions in this claim are based; and Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions that may exist and has voluntarily provided the information to the Government before filing an action.  Relator is either entitled to between 15-25 percent of the proceeds that results from this action or any settlement of the claims raised or identified herein, under 31 U.S.C. § 3730(d)(1); or between 25-30 percent of the proceeds, pursuant to 31 U.S.C. § 3730(d)(2).

33.    Defendant Laboratory Corporation of America Holdings (LabCorp) advertises itself as the "world's leading health care diagnostics company," furnishing and billing a vast number of laboratory services including substance abuse testing, and advertises "more than 1700 specimen collection sites (patient

12

service centers) located through the U.S." LabCorp is headquartered in Burlington, North Carolina.

34. LabCorp represents that it has numerous business operations in every state, except Vermont and Hawaii. On information and belief, however, LabCorp may be receiving Medicaid funds from Vermont and Hawaii.

35. LabCorp participates throughout the United States in the Medicare, Medicaid, TRICARE, FEHBP, and the VA health care programs, as well as the private insurance plans in the states of California and Illinois. The allegations in this Complaint apply to these programs.

36. Defendant North Georgia Healthcare Center (NGHCC) is located at 6120 Alabama Highway, Ringgold, Georgia 30736.

37. NGHCC is a Federally Qualified Health Center (FQHC), which is a community-based health care provider that receives funds from the U.S. Department of Health and Human Services (HHS), Health Resources & Services Administration (HRSA) to provide primary care services in underserved areas.

38. At least 70 percent of the patients seen at NGHCC are Medicare or Medicaid beneficiaries.

39. NGHCC advertises itself as a non-profit and grant-funded organization that offers a broad array of healthcare services, including

13

family/internal medicine, occupational medicine, dentistry, pediatrics, physical/aquatic therapy, patient medicine assistance, pharmacy, behavioral health, education program, and women's health; and, a facility that is federally funded by the U.S. Department of Agriculture.  NGHCC is headquartered in Ringgold, Georgia.  NGHCC participates in the Medicare, Medicaid, TRICARE, FEHBP, and the VA health care programs.

40.     Defendant Delaine Hunter is the President and CEO of NGHCC and has served in that position since at least as early as 2009.  According to NGHCC's website, she holds an Associate Degree in Pharmacology.

41.     Defendant Dr. Gary Smith is the Medical Director at NGHCC and has served in that position since at least as early as 2009.

### B.     Jurisdiction and Venue

42.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and 28 U.S.C. § 1331.

43.     Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) because one or more defendants may be found, resides, and/or transacts business in this District, or because an act, proscribed by 31 U.S.C. § 3729, occurred in this District.

44.     LabCorp has stand-alone laboratory locations in the Northern District of Georgia that perform drug screenings, including, but not limited to the following locations:

- 550 Peachtree Street NW #1460, Atlanta, GA 30308

- 315 Boulevard NE #532, Atlanta, GA 30312

- 5667 Peachtree Dunwoody Road, Atlanta, GA 30342

- 975 Johnson Ferry Road NE, Atlanta, GA 30342

- 755 Mount Vernon Highway, Atlanta, GA 30328

45.     On information and belief, LabCorp also likely has placed in-house phlebotomists at medical practices in Atlanta and in other parts of the country.

46.     LabCorp has key senior executives in the Northern District of Georgia, including, at a minimum, the positions of regional manager business development and regional business development executive.

47.     North Georgia HealthCare Center is located at 6120 Alabama Highway, Ringgold, Georgia 30736.

## C.     The Applicable Laws, Which Have Been Violated

### 1.     The Federal False Claims Act

48.     The False Claims Act provides, in part: Liability for Certain Acts.

—

(1) In general.—[ ] any person who— (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [ ] (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, [ ] is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104– 410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a)(1)(A), (B), (G).

49.    Under the False Claims Act, scienter must be demonstrated:

**Definitions—**

For purposes of this section— (1) **the terms "knowing" and "knowingly"**— (A) mean that a person, with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud; (2) **the term**

16

"**claim**" — (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that— (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government— (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; [] . 31 U.S.C. § 3729(b)(1)-(2).

### 2.    The Anti-Kickback Statute

50.    The Anti-Kickback Statute provides additional causes of action under the False Claims Act: (b) **Illegal remunerations**—(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind— (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any

17

good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.  (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person— (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S.C. § 1320a-7b(b).

51.    (h) **Actual knowledge or specific intent not required**—With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.  42 U.S.C. §1320a-7b(h).

### 3.     The State False Claims Acts

52.     The False Claims Act of 32 states and the District of Columbia are

alleged in this Complaint, including the states of Arkansas, California, Colorado,

Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa,

Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana,

Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina,

Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Wisconsin, and

Washington.

### 4.     The California and Illinois Insurance Fraud Prevention Acts

53.     The states of California and Illinois have enacted Insurance Fraud

Prevention Acts that permit Relator to bring a *qui tam* action to recover for

fraudulent claims submitted to private insurance companies in those states, as

alleged in the Counts below.

54.     The fraudulent practices alleged in this Complaint have caused harm

to private insurance companies in the states of California and Illinois in the same

manner that the practices defrauded the federal and state governments.

55.     The alleged kickback scheme that Defendants pursued added

substantial costs to federal and state health care programs in the states named in

this Complaint, and private insurers in California and Illinois.

19

56.     California state law prohibits Defendants from providing kickbacks to physicians and medical care providers.   Specifically, **California Business & Professional Code § 650(a)** provides: "[T]he offer, delivery, receipt, or acceptance by any person licensed under this division or the Chiropractic Initiative Act of any rebate, refund, commission, preference, patronage dividend, discount, or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers to any person, irrespective of any membership, proprietary interest or co-ownership in or with any person to whom these patients, clients, or customers are referred is unlawful."

57.     **California Penal Code § 549** makes it illegal for any firm or corporation to "solicit[], accept[],or refer[] any business to or from any individual or entity with the knowledge that, or with reckless disregard for whether" that individual or entity will present or cause to be presented any false or fraudulent claim for payment of a health care benefit.

58.     **California Insurance Code § 1871.7(a)** prohibits the knowing employment of "runners, cappers, steerers or other persons to procure clients or patients ... to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer."

20

59.    **California Insurance Code § 1871.7 (b)** provides for civil recoveries against person who violate the provisions of Penal Code sections 549 or 550. Section 550 of the Penal Code prohibits the following activities, among others: "(a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:

\*\*\*\*\*\*\*\*\*\*

(5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim; (6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

\*\*\*\*\*\*\*\*\*\*\*\*

(b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following: (1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact; (2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of our opposition to, any claim or payment or

other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact; (3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

60.    **Illinois Insurance Claims Fraud Prevention Act, §5(b)** provides:  A person who violates any provision of this Act or Article 46 of the Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance.

61.    **Illinois Criminal Code, Article 46** provides criminal penalties for any person who commits the offense of insurance fraud.  720 Ill. Comp. Stat. §5/46-1(a).

62.    **Illinois Insurance Claims Fraud Prevention Act §15(a)** provides for a *qui tam* civil action to create incentives for private individuals to prosecute violations of the statute.  740 Ill. Comp. Stat. §92/15(a).

63.     The Illinois Insurance Claims Fraud Prevention Act makes it unlawful for any person to knowingly obtain, attempt to obtain, or cause to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim and by causing a false claim to be made on a policy of insurance issued by an insurance company. 740 Ill. Comp. Stat. §92/5(b) and 720 Ill. Comp. Stat §5/46-1(a).

## III.  THE REGULATORY FRAMEWORK

### A.     The Federal-State Health Care Programs

#### 1.     Medicare

64.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq*., known as the Medicare program. CMS administers the Medicare program. At all times relevant to this complaint, CMS contracted with private contractors, referred to as "fiscal intermediaries," "carriers," and Medicare Administrative Contractors ("MACs"), to act as agents in reviewing and paying claims submitted by health care providers. 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104. The Medicare program consists of four parts: A, B, C and D.

65.    Defendants billed Medicare under Part B, which covers certain medical services, such as clinical laboratory test services.  42 U.S.C. § 1395k(a)(2)(B).

66.    To participate in the Medicare program as a new enrollee, providers like Defendants must submit a Medicare Enrollment Application, CMS Form-855B.  Defendants are also expected to complete Form CMS-855B to change information or to reactivate, revalidate, and/or terminate Medicare enrollment.

67.    Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations.  42 C.F.R. § 424.516.

68.    An authorized official must sign the "Certification Section" in Section 15 of Form CMS-855B, which "legally and financially binds [the] supplier to all of the laws, regulations, and program instructions of the Medicare program."

69.    Defendants signed a Form CMS-855B stating that they understood they were required to comply with Medicare laws, regulations, and program instructions, which include, but are not limited to, the Stark Law and the Anti-Kickback Statute.

70.    To obtain Medicare and Medicaid reimbursement for certain outpatient items or services, providers submit a claim form known as the CMS

24

1500 form ("CMS 1500") or its electronic equivalent known as the 837P form. That claim form is often based on an order form reflecting those services ordered by the physician who signs the form, often called a "superbill." Because the superbill details the rendering physician and the services ordered, it should match the CMS 1500 form and support the claim billed.

71.     Among the information the provider includes on a CMS 1500 or 837P form are certain five-digit codes, including Current Procedural Terminology Codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") codes, that identify the services rendered and for which reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source." Those same CPT codes are reflected on the superbill.

72.     The Medicare statute requires that each request for payment or bill submitted for an item or service payable under Medicare Part B include the name and unique physician identification number for the rendering physician. 42 U.S.C. § 13951(a)(1).

### 2.     Medicaid Federal-State Health Care Program

73.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal portion of

25

each state's Medicaid payments varies by state and is generally between 50 and 83

percent, depending on the state's per capita income.  42 U.S.C. § 1396d(b).

74.    State Medicaid programs contain specified minimum criteria for

coverage and payment of claims to qualify for federal funds for Medicaid

expenditures.  42 U.S.C. § 1396a.

75.    Providers and laboratories certify in their state Medicaid provider

enrollment forms that they will comply with all federal and state laws applicable to

Medicaid.

### 3.    The TRICARE Program

76.    TRICARE is a managed health care program established by the

Department of Defense.  10 U.S.C. §§ 1071-1110.  TRICARE provides health care

benefits to eligible beneficiaries, which include, among others, active duty service

members, retired service members, and their dependents.

### 4.    The Federal Employee Health Benefits Program

77.    The Federal Employee Health Benefits Program ("FEHBP") is a

federally-funded health care program established by Congress in 1959, pursuant to

the Federal Employees Health Benefits Act.  5 U.S.C. §§ 8901, *et seq*.

78.    The U.S. Office of Personnel Management ("OPM") administers this

program and contracts with various health insurance carriers to provide services to

26

FEHBP members.  *Id.* at §§ 8902, 8909(a).

79.     Monies for the FEHBP are maintained in the Employees Benefits Fund ("Treasury Fund"), which OPM administers.  *Id.* at § 8909(a).  The Treasury Fund – which the United States Treasury holds and invests – is the source of all relevant payments to the insurance carriers for services rendered to members.  *Id.* at § 8909.

### 5.     The U.S. Department of Veterans Affairs

80.     The U.S. Department of Veterans Affairs (VA) maintains a system of medical facilities from which medical services are purchased directly or indirectly by the VA on behalf of beneficiaries.  The system serves millions of veterans.

### 6.     The Consolidated Health Center Program

81.     A Federally Qualified Health Center (FQHC) is a community-based health care provider that receives funds (including U.S.D.A. grants) from the Health Resources & Services Administration (HRSA) to provide primary care services in underserved areas.  https://www.hrsa.gov/opa/eligibility-and-registration/health-centers/fqhc/index.html  FQHC's are authorized by 42 U.S.C. 1396d § 1905(l)(2)(B).

### B.     The Classification of Certain Dangerous and Addictive Drugs by the U.S. Drug Enforcement Administration (DEA)

82.     Administration of certain pharmaceutical products, including certain

27

narcotics classified by the DEA as Schedule I, II, III, or IV drugs, requires written

prescriptions by a practitioner. Oral orders are only permitted in emergencies.

U.S. DOJ, Drug Enforcement Administration, Office of Diversion Control,

Practitioner's Manual: An Informational Outline of the Controlled Substances Act

("DEA Manual"), at 23 (2006).

83.     DEA Schedule I controlled substances are drugs that have not been

adopted as safe and effective for medical use, including drugs like heroin, LSD,

and marijuana. U.S. DOJ, Drug Enforcement Administration, Office of Diversion

Control, "Controlled Substance Schedules,

https://www.deadiversion.usdoj.gov/schedules/

84.     DEA Schedule II drugs are substances that "have a high potential for

abuse which may lead to severe psychological or physical dependence," including

drugs like methadone, Oxycodone, Percocet, and Fentanyl. U.S. DOJ, Drug

Enforcement Administration, Office of Diversion Control, "Controlled Substance

Schedules, https://www.deadiversion.usdoj.gov/schedules/

85.     DEA Schedule III drugs are substances that have potential for abuse

and "may lead to moderate or low physical dependence or high psychological

dependence," including drugs like Tylenol with codeine and buprenorphine

(suboxone). U.S. DOJ, Drug Enforcement Administration, Office of Diversion

Control, "Controlled Substance Schedules,

https://www.deadiversion.usdoj.gov/schedules/

86. Schedule IV drugs are substances that "have a low potential for abuse

relative to Schedule III" but still have serious addictive properties that can lead to

drug abuse and dependence such as Xanax, Klonopin, Valium, and Ativan. U.S.

DOJ, Drug Enforcement Administration, Office of Diversion Control, "Controlled

Substance Schedules, https://www.deadiversion.usdoj.gov/schedules/

## IV. FRAUDULENT SCHEME

### A. LabCorp Unlawfully Induced Referrals for Unnecessary, Excessive and Ineffective Drug Testing Through Discounted Lab Rates, Placing Staff In-House, and Providing Specimen Collection Supplies

87. LabCorp induced referrals for unnecessary and excessive drug testing

by offering providers like NGHCC discounted lab rates and providing in-house

LabCorp staff and free specimen collection supplies to draw patient blood and

sample urine at the provider's site. In doing so, LabCorp guaranteed referrals for

excessive and unnecessary drug testing, in violation of the Anti-Kickback Statute

and the various False Claims Acts.

### 1.     Defendants Well Know the Drug Testing Requirements are Material to Payment

88.     There are different types of drug testing and for each type of drug testing, there is a corresponding code and reimbursement amount.

89.     Drug testing is used to determine the presence or absence of drugs or metabolites, also known as "analytes," in a patient's system.

90.     Drug testing can be "qualitative" (to determine the presence or absence of an analyte) or "quantitative" (to provide a numerical concentration of an analyte). Different testing methodologies have different capabilities and limitations.  Qualitative drug testing is also known as "confirmatory" drug testing, i.e., testing for the presence of a drug in a patient's system.

91.     LabCorp performs both types of drug testing, including qualitative and quantitative, and bills the federal, state and private-insured health care plans for drug testing.

92.     In the clinical health care context, drug testing can be used to monitor whether patients are taking prescribed drugs or taking or abusing drugs not prescribed.

93.     CMS contractors counsel that qualitative or initial drug screens must be justified in the patient's medical record stating:

Drugs or drug classes for which screening is performed

30

> should only reflect those likely to be present, based on the patient's medical history or current clinical presentation and without duplication. **Each drug or drug class being tested for must be indicated, by the referring clinician, in a written order and so reflected in the patient's medical record. Additionally, the clinician's documentation must be patient specific and accurately reflect the need for each test**.

Health Care Services Corporation (HCSC) Medical Policy MED207.154 (emphasis added)

94.    CMS contractors further state that routine screenings, including initial drug screen panel testing, standing orders to test patients irrespective of the patient's medical condition, and validity testing to confirm that drug tests are accurate and valid are <u>not reimbursable</u>.

> Orders for diagnostic tests, including laboratory tests, must be specific to both the patient and the need for the test requested. Panel testing is restricted to panels published in the current CPT manual. **Orders must be signed and dated by the ordering health care professional.** "Custom" panels are not specific to a particular patient and are not allowed. Further, the following are not reimbursable: **Routine screenings, including quantitative (definitive) panels, performed as part of a clinician's protocol for treatment, Standing orders which may result in testing that is not individualized and/or not is used in the management of the patient's specific medical condition and Validity testing, an internal process to affirm that the reported results are accurate and valid**. Claims that are accompanied by medical records that do not meet documentation requirements will not be reimbursed.

31

BlueCross BlueShield of Oklahoma, Lab Billing Guidelines (2017), https://www.bcbsok.com/pdf/2017-billing-and-documentation-guidelines-drug-testing.pdf (emphasis added)

95. The clinical value of either "confirmatory" or "quantitative" laboratory testing depends on a patient's medical condition. The clinical utility of "confirmation" or "quantification" of substance abuse test results depends, in part, on whether the test result is expected or unexpected, and the patient's drug abuse history and clinical presentation.

96. For example, if a patient is prescribed an opioid-based drug, but the initial test result is negative, then a quantitative laboratory test to "confirm" whether this unexpected negative result is accurate may be reasonable and necessary. This is a "confirmatory" test.

97. Similarly, if a patient's test reflects a positive result for a non-prescribed or illegal drug, then a quantitative laboratory test to evaluate (i.e., "confirm") this unexpected positive result may be reasonable and necessary.

98. CMS counsels that "confirmation of drug screens is only indicated when the result of the drug screen **is different** than that suggested by the patient's medical history, clinical presentation or patient's own statement." Local Coverage Determination (LCD): Controlled Substance Monitoring and Drugs of Abuse

Testing (L36029) (emphasis added).

99.    CMS contractors further instruct:

> **Confirmatory testing is not appropriate for every**
> **specimen and should not be done routinely.** This type
> of test should be performed in a setting of unexpected
> results and not on all specimens. **The rationale for each**
> **confirmatory test must be supported by the ordering**
> **clinician's documentation**. The record must show that an
> inconsistent positive finding was noted on the qualitative
> test testing or that there was not an available qualitative
> test to evaluate the presence of semisynthetic or synthetic
> opioid in a patient.

Health Care Services Corporation (HCSC) Medical Policy MED207.154 (emphasis

added).

100.   There may be other instances when confirmatory laboratory testing is

reasonable and necessary, but such justification is required to be documented in the

medical record and include a specific physician assessment of the patient and need

for such a test.

101.   Without these bases, a quantitative or confirmatory laboratory test for

a particular drug is not reasonable and necessary for the treatment and diagnosis of

the patient, and not coverable by the health care insurance programs.

102.   As demonstrated by its own statements on its website, LabCorp knew

that urine drug tests are to be used for limited purposes and that the reasons for the

tests are required to be specifically well-documented in the medical records.

103.   LabCorp counseled providers on when urine drug testing is necessary and the purpose of the drug tests:

> Sometimes required prior to the start of a new job or insurance policy; randomly for workplace drug testing or athletic drug testing programs; as mandated when court-ordered; **as indicated when ordered by a health practitioner to monitor a known or suspected substance abuse patient**; **sometimes** when you are pregnant, will be receiving an organ transplant, **when you are prescribed pain medication, or when you have symptoms suggesting drug intoxication or overdose**.

LabCorp Website, "Drug Abuse Testing," https://www.labcorp.com/help/patient-test-info/drug-abuse-testing  (emphasis added).

104.   According to LabCorp, the purpose of drug testing is "to screen for and confirm the presence of several drugs in a person's sample, such as urine, blood or hair.  Drug testing is used so that a person may receive appropriate medical treatment or be screened for or monitored for illegal drug use."  LabCorp Website, "Drug Abuse Testing," https://www.labcorp.com/help/patient-test-info/drug-abuse-testing

105.   LabCorp itself details the signs and symptoms that should be documented in the medical record to justify drug testing, if not related to employee monitoring, and stems from a suspicion of substance abuse, including:

a.  Dilated or small pupils

b.  Drowsiness

34

    c. Slow or slurred speech

    d. Agitation

    e. Nausea

    f. Difficulty breathing

    g. Delirium

    h. Seizures

    i. Changes in blood pressure or heart rhythm

LabCorp Website, "Drug Abuse Testing," https://www.labcorp.com/help/patient-test-info/drug-abuse-testing

106. LabCorp also recognizes that confirmatory testing of a positive initial drug screening is "**in most circumstances . . . not necessary**," explaining that "[i]nterpretation of when and how much drug was consumed can be challenging because the concentration of many drugs varies, as do people's rates of metabolism." LabCorp Website, "Drug Abuse Testing," https://www.labcorp.com/help/patient-test-info/drug-abuse-testing  (emphasis added)

107. NGHCC knew it was obligated as a federal, state, and private insured provider to be knowledgeable of the billing regulations for urine and blood drug testing as established by CMS to ensure the safety, accuracy and quality of diagnostic testing.

35

108.   LabCorp knew it was obligated to "maintain all patient medical records supporting a lab test as reasonable and necessary" before submitting a claim on behalf of that patient for the drug testing, but routinely failed to do so.

109.   LabCorp knowingly failed to ensure that there were medical documentation and doctors' orders supporting its excessive and worthless lab services before submitting thousands of claims to federal, state, and private payors for initial and confirmatory drug screens.

### 2.   LabCorp's Kickbacks to NGHCC Led to Excessive Billing for Unnecessary and Worthless Drug Testing

110.   LabCorp knowingly submitted and caused to be submitted false claims to the government-insured health care programs for non-covered drug testing that was not reasonable and necessary and resulted in worthless testing.  42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 410.32(a); MBPM, Ch. 15, Section 80.6.1.

111.   On information and belief, LabCorp also knowingly submitted and caused to be submitted false or fraudulent claims to California and Illinois private-insured health care programs for non-covered drug testing that was not reasonable and necessary and resulted in worthless testing.

112.   LabCorp encouraged providers to order laboratory tests on a routine basis without an individualized assessment of which drug tests were necessary for a given patient.

36

113. LabCorp also provided unlawful remuneration to providers like NGHCC, including discounted lab rates, free in-house lab staff, services, and supplies, and perks like free lunches, to guarantee and induce referrals and encourage excessive testing.

114. LabCorp created a fee schedule for NGHCC that reflected significant discounts.

115. According to the Chief Financial Officer Person A at NGHCC, LabCorp was providing this same discounted fee arrangement to many other healthcare providers.

116. As reflected in internal documents, LabCorp offered NGHCC special prices that reflected a more than 60 percent discount for certain "discountable" tests.

117. The customized fee schedule was specific to self-pay patients who weren't covered by one of the government or private insurers. NGHCC was responsible to pay the per service fees to LabCorp for self-pay patients but the significant discounts offered by LabCorp reduced the provider's financial obligation.

118. To make up for this significant discount to routine Medicare reimbursement rates for these type of laboratory tests, LabCorp either induced NGHCC to order drug screening tests for every patient each and every month, or LabCorp conducted and billed for the tests even without a physician's order.

119.   As a Federally Qualified Healthcare Center, NGHCC was obligated to provide lower rates for patients at NGHCC expense, so the discounted fee schedule offered by LabCorp served as an inducement for more drug testing referrals. Further, if the self-pay patients defaulted on their payments to NGHCC, the discounted rates that NGHCC paid LabCorp helped reduce NGHCC's costs of default.

120.   For example, LabCorp offered a discount of $35 per sample for a typical urine drug test. This reflects an approximate 50 to 75 percent discount from the typical Medicare reimbursement rate during the same time period. By offering a discounted rate of $35, LabCorp induced providers to send self-insured patient business to NGHCC and expanded NGHCC's beneficiary population. NGHCC was responsible for collecting those charges discounted for self-insured patients. Because of the benefit from the discount, NGHCC marked-up the cost of the urine drug tests, charging self-insured patients $40 and pocketing the $5 difference after paying LabCorp its $35 discounted rate.

121.   This payment structure encouraged NGHCC to order excessive urine drug tests for self-insured patients because for every test performed by LabCorp, NGHCC pocketed an extra $5, which added up given the volume of testing that was taking place. LabCorp was comfortable offering this discounted rate for self-insured

patients because LabCorp made up for the difference by excessively testing and billing Medicare and Medicaid patients. The arrangement was a win-win for the health care entities at the expense of the Medicare and Medicaid programs (and other insurers).

122. NGHCC further benefitted from this kickback arrangement because it allowed NGHCC to advertise discounted rates for self-pay patients, particularly those required to have testing for drug abuse, with significantly reduced expense to NGHCC; the arrangement further allowed NGHCC to bill for other medical services for those same patients.

123. LabCorp excessively billed the health care programs for initial drug screens and confirmatory tests that were reimbursed $100 - $250 per service to fraudulently subsidize the discounts it was providing self-pay patients.

124. Through this arrangement, LabCorp was able to generate a steady referral stream of drug screen testing. As a result, NGHCC's laboratory testing for its patients skyrocketed.

125. LabCorp was so excessively performing (and billing for) drug tests that even NGHCC patients noticed. NGHCC Compliance Officer Person B explained to management on March 18, 2018, with regard to urine drug testing (UDS):

> One of the patients that called last week stating they were going to report us for Dr. Smith not seeing [Person C]'s

patients once every 3 months also stated that he was going
to ask that the State to [sic] investigate our number of drug
screens and if we were discriminating.  Not much to stand
on probably but I think we do need to be able to explain,
if asked by Medicare or the State, **why the number of our
UDS tests have increased substantially.  [Person D] has
the tracking info for this and the YTD is substantially
more, obviously, this year v. last.**

126.   Licensed Practical Nurse (LPN) Person D responded to all:

**In January 2017 there were 27 UDS's collected
compared to January 2018 344 UDS's were collected.**
I can pull numbers for other months if needed.  I just had
this one right off hand because I was working on UDS
tracking this past Friday.

(emphasis added)

127.   Initial drug screen testing at NGHCC became so routine that there were

times when NGHCC's superbills (an itemized form used by healthcare providers for

reflecting rendered services and the main data source for creation of healthcare

claim, which is submitted to the healthcare programs for reimbursement) to the

government-insured programs did not match what LabCorp was submitting to the

government-insured programs.  This concerned LabCorp because it feared that the

discrepancies would serve as a red flag in an audit with the federal and state health

insurers.  Accordingly, LabCorp worked with NGHCC to obtain orders, often after

the lab services were provided.

128.   Because CEO Hunter was concerned that this kickback scheme could

be detected by the health care insurers, she limited the number of staff who had knowledge of the arrangement to the CFO and Relator—only those who had a need to know.

129.   Both LabCorp and NGHCC tried to keep the terms of their arrangement known only to executive-level staff.   While NGHCC's business or professional relationship with numerous other practices was generally known by staff, CEO Hunter treated the terms of NGHCC's business relationship with LabCorp as a close-hold.   Most NGHCC staff were unaware of the terms of engagement between NGHCC and LabCorp, and Relator was told that Hunter kept the written contract, which she did not have access to, in a locked drawer.

130.   Although Relator was NGHCC's lead billing specialist, CEO Hunter did not want Relator to have any more access to (or detail of) billing discrepancies between what NGHCC provided the health care insurers and what LabCorp provided them than was necessary.   Instead, the CEO directed the CFO to take the lead on reconciling discrepancies with the assistance of Relator.   As a result, LabCorp's claims submissions generally were not shared with Relator, even though this practice was inefficient to reconcile the billing inconsistencies.

131.   As one example of inconsistent billing, in November 2017, Relator informed CEO Hunter that there was no charge or order reflected on a NGHCC

41

superbill in contrast to the LabCorp's submission to the insurer for the lab services to the same patients. The CFO instructed Relator to add the charges for drug screens to the superbill so that the NGHCC and LabCorp documentation matched.

132. In that same exchange, the CFO chastised Relator for making the LabCorp discount apparent to the insurer on the superbill. Relator had correctly used a CPT lab code for reimbursement (Code 80307) and then discounted that Code to accurately reflect the $40 rate that LabCorp provided NGHCC. Instead, the CFO directed Relator to use a generic CPT code (Code 80300) and manually change the charge to $40 to avoid detection of the LabCorp discount to the reimbursement charge, in the event of an insurer audit:

> Also, [Relator], I noticed you are now using a different drug test code instead of 80300 you are now using 80307 that has a charge of 56.96, but you are adjusting 16.96 off so that it is still $40. Please go in and make sure that this code has the charge set up for $40 so adjustments are not needed. This can be confusing during audit and letting auditors know what we adjusted and why. Please let me know when the charges have been updated. These patients will need to go ahead and be sent a statement after you add the charges.

133. LabCorp also performed quantitative or confirmatory testing on lab results without a physician's order or without documented medical necessity for the testing.

134. For laboratory testing to be payable, CMS requires that the following

conditions be met:

> Laboratory tests must be ordered by the physician or NPP [non-physician practitioner] who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician or NPP who is treating the beneficiary are not reasonable and necessary.

> The physician or qualified NPP who ordered the test must maintain the documentation of medical necessity in the beneficiary's medical record.

> Entities submitting a claim must maintain documentation received from the ordering physician or NPP.

CMS Medicare Learning Network, "Provider Compliance Tips for Laboratory Tests – Other," February 2018, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/ProviderComplianceTipsforLaboratoryTests-ICN909407.pdf

135. LabCorp was legally obligated to ensure that the laboratory tests it was performing and billing for were ordered (in writing) by a physician or NPP. However, in the limited instances where there were written lab orders for patients, they were often signed by NPPs without supervision and not physicians.

136. In some instances, the laboratory tests were improperly ordered by a

medical student and not an authorized NPP or physician.

137.   LabCorp was further required to ensure that there was documentation in the patient's medical record to show that both the initial drug screen and the confirmatory tests were reasonable and necessary in the treatment of the patient. In the medical records obtained by Relator, there is no order and no justification for confirmatory testing for the patients and little (or no) justification for the frequency of initial drug screens. Yet, for each patient, LabCorp performed the testing and received reimbursement.

138.   LabCorp quite literally overwhelmed NGHCC with qualitative and quantitative (confirmatory) drug screen results, leading to no physician or NPP reviewing the results of the tests or using them for diagnoses or treatment of the patient, on information and belief.

139.   One patient reported the problem to the Medicare fraud hotline, as NGHCC's Compliance Officer informed CEO Hunter and the CFO on March 19, 2018:

> "Just received a complaint from a patient that stated he has called the state and the Medicare Fraud hotline: "Lack of lab follow-up and proper diagnosis.""

140.   In addition to offering discounts to NGHCC's self-pay patients to guarantee a steady referral stream, LabCorp also placed a LabCorp salaried phlebotomist on site at NGHCC, which allowed immediate testing and lab services

on-site.

141.   To further guarantee that the lab samples would be drawn (and billed), LabCorp provided thousands of dollars' worth of urine cups, syringes, and related lab products free of charge.

142.   LabCorp on-site staffing, services and supplies were another form of kickbacks that further guaranteed a steady referral stream of testing, which were not reasonable or necessary.

143.   While the placement of a phlebotomist in-house is not necessarily improper, HHS-OIG Special Advisory Opinion advises that:

> Where the phlebotomist performs clerical or medical functions not directly related to the collection or processing of laboratory specimens, a strong inference arises that he or she is providing a benefit in return for the physician's referrals to the laboratory.  In such a case, the physician the phlebotomist, and the laboratory may have exposure under the anti-kickback statute.  This analysis applies equally to the placement of phlebotomists in other health care settings, including nursing homes, clinics and hospitals.

HHS-OIG Special Advisory Opinion, FR Doc. 94-31157 (Dec. 2, 1994).

144.   LabCorp provided discounted fees and services and supplies (such as urine cups and other specimen collection items) free of charge in addition to the in-house phlebotomist.

145.   As additional inducement to refer patients for lab testing, LabCorp provided perks to NGHCC such as free lunches.

### 3.   Nationwide Data Corroborates the Relator's LabCorp Allegations

146.   LabCorp provides extensive clinical laboratory services.  In its annual report for 2017, it informed the investing public that it processed testing "on more than 2.5 million patient specimens per week."

147.   LabCorp's success is driven by the 1,900 patient service centers it operates throughout the United States and the "more than 5,000 in-office phlebotomists who are located in customer offices and facilities."  LabCorp 10-K Filing, at page 7.

148.   LabCorp reported that in 2017, it "derived approximately 15.1% of its net revenue from the Medicare and Medicaid programs," further stating that "LCD's other commercial laboratory testing business that is not directly related to Medicare or Medicaid nevertheless depends significantly on continued participation in these programs and in other government healthcare programs, in part because customers often want a single laboratory to perform all their testing services."  LabCorp 10-K Filing, at page 24.

149.   Current and former employees of LabCorp—line-level lab technicians, specimen accessioners, sales marketers, in-house phlebotomists, and

46

managers—in LabCorp's corporate offices, regional offices and labs across the country —have corroborated Relator's allegations since as early as October 2009:

- There is zero focus on quality and accurate results, but on turn-around time, communication is almost non-existent, lack of compliance (former employee in Denver, Colorado)

- All management cares about is how much work you can turn out and how fast you can turn it out. It is not quality driven it is money-driven (current employee in Burlington, NC)

- All what the lab tech management look for is to be fast and how many samples and results you can complete. Lab tech management don't care about quality, but they care about numbers. Very poor training for new hire lab tech with high expectations to finish the work fast (former clinical lab supervisor in Phoenix, AZ)

- From the onboarding experience to training to the expectation of production, everything is unrealistic, and slave-driving is the standard. They expect you to know the job and perform on your own in 2 weeks and its sink or swim though there is so much to know, yet precision is expected (current customer service representative in Tampa, FL)

47

- They care a lot about numbers (how many specimens you accession in a day) so speed is important. They fire and hire people frequently; many ins and outs of this company (current specimen accessioner in Calabasas, CA)

- Culture at LabCorp is abysmal. LabCorp uses fear and intimidation to "motivate" their employees. You will constantly work on billing problems because LabCorp has horrible billing practices and when you have had enough of that the Lab cannot seem to spit out a CBC without problems (current regional business development manager)

- Company was driven by numbers and revenue. Sales Reps were treated like royalty even when they didn't perform. Got free trips and bonuses they didn't deserve. (former IT manager in New Haven, CT)

- Management started micro-managing the techs to ensure we were meeting goal every hour (former technologist trainee in Burlington, NC)

- Processing specimens is nothing short of an assembly line worker. You have to meet quotas every time and the amount of work is unreal (former specimen accessioner)

- Most importantly they do not care about our precious patients.   Over worked/ Underpaid (wanting results pumped out as fast as possible and no

regards to proper training for technical staff or any position for that matter.) (former employee)

- Patient quality is not top priority.  Knowing what I know, if I was a patient, I would insist that my blood work be sent to another lab.  (current employee in Burlington, NC)

- As a company who report results back to clients, the main concern should be integrity of the results reported.  However, for this company it is all about the numbers.  How many samples can get processed as quickly as possible.  Some employees are even subjected to a quota, which puts unnecessary pressure on the employee and increases the probability of mistakes which is unfair to the client as well as the patient. (current specimen accessioner in Research Triangle Park, NC)

- Corporate LabCorp is much too focused on the bottom line over patient care.  No time allotted to speak with doctors because this job is treated as production work in a factory because of under staffing. (current phlebotomist in Seattle, WA)

- Illegible doctors' orders, doctors that don't give patients orders although patients told they would, increasing patient wait times.  Company cares more

49

about their bottom line than the customers.  (former phlebotomist in Seattle,
WA)

- You are graded on how fast you can enter data into the computer.  (former
  billing specialist in Greensboro, NC)

- company cares about quantity of tests not quality (former cytotechnologist in
  Tampa, FL)

- The changes that I am forced to make every week or month has been so
  disturbing that my constant griping about patient care actually got me
  threatened with being written up by management for insubordination.
  LabCorp continually wants changes that will increase profit while directly
  harming patient care.  Management has stated that they care more about
  profit than patients and I can attest to that being absolutely factual. (former
  employee in Phoenix, AZ)

### 4.    Examples of False or Fraudulent Claims Submitted by LabCorp

150.  LabCorp routinely billed for drug testing that was not reasonable and
necessary (and was worthless) and caused the government and private-insured
programs to pay more than they otherwise would have paid.

151.  LabCorp billed for initial drug screens involving individual drugs and
multiple panel tests in instances where the provider ordered a urine drug test (UDT)

with no specification of what drugs to test for and without regard to whether confirmatory tests were necessary.

152.   In some instances, LabCorp was unnecessarily testing (and billing) for the presence of common and over-the-counter drugs such as acetaminophen (Tylenol) and guaifenesin (Mucinex or over-the-counter cough syrup) without any medical justification.

153.   In other instances, LabCorp repeatedly tested (and billed), sometimes every month, for drugs that the provider was continuing to prescribe.  There was no documentation of medical necessity for tests of drugs that the patients were expected to take as prescribed or for monitoring to ensure the patients were taking the drugs as prescribed.

### i.   Patient 1

154.   Medicaid Patient 1 is an example of unreasonable and unnecessary (and worthless) drug testing for which LabCorp received reimbursements from Medicaid.

155.   In February 2013, NGHCC staff saw Patient 1 whose chief reason for the visit, according to the medical record, was a need for prescription refills: "Pt. states that the pharmacy here knows the medications she needs refilled."  Patient 1 was taking 9 medications.

156.   According to the medical records for Patient 1, she routinely scheduled

a visit to obtain refills on her prescriptions. During the January 2016 office visit, Patient 1 stated that her "symptoms are controlled [but she] presents for refills on all medications. Had narcotics stolen 3 weeks ago while out of town." NGHCC staff wrote Patient 1 prescriptions for opioids at that visit, which she had filled at NGHCC'S on-site pharmacy.

157. Once LabCorp provided on-site services, NGHCC staff routinely ordered urine drug screen tests for Patient 1, the on-site LabCorp phlebotomist performed the tests, and Medicaid paid the claims.

158. On March 15, 2017, the medical records show that laboratory tests were performed for Patient 1. The test results demonstrated an unexpected presence of methadone – a DEA Schedule II drug—in Patient 1's system. However, no confirmatory test was performed to evaluate the quantity of methadone in Patient 1's system. Failure to address the presence of methadone was detrimental to Patient 1's well-being. This serious oversight was compounded by the fact that a physician was not receiving or reviewing the results for evaluation and treatment.

159. LabCorp's protocol was blame. Because LabCorp performed only confirmatory tests for expected drugs and did so without a written physician order, significant testing results for the presence of methadone were overlooked. However, LabCorp's standing protocol (to obtain positive results for expected drugs) did allow

52

LabCorp to avoid raising red flags with regulators that would lead to detection of its excessive billing.

160.   The focus upon testing only for expected results in Patient 1 led to the provider (and LabCorp) being inundated with unnecessary test results that led to a material oversight—namely, that Patient 1 had methadone in her system.

161.   On May 31, 2017, LabCorp tested Patient 1 for all her prescription drugs.  Of course, she tested positive and these results were expected.  And, once again, Patient 1 tested positive for unexpected traces of methadone, morphine, and tizanidine.  There is nothing in Patient 1's medical records to show that she was counseled or informed about the finding of the presence of these dangerous drugs in her system.

162.   LabCorp continued to test (and bill Medicaid for) Patient 1.  However, those tests were for common, over-the-counter drugs, including acetaminophen (Tylenol) and guaifenesin (Mucinex).

163.   LabCorp's tests also continued to show the presence of unexpected opioids in Patient 1's system, including methadone and morphine (DEA Schedule II drug) and carboxy THC (a precursor to cannabis).  At some point, LabCorp tested (and billed for) confirmatory tests (without a physician's order) for hydrocodone— an opioid drug that Patient 1 was prescribed.   To the extent there were physician

53

orders for lab services in the medical records for Patient 1, they were signed by NPP Person C without any oversight by a physician.

164.   As shown by this example, Relator is aware that NPP Person C improperly routinely saw patients, ordered lab services, and started patients on drugs without any physician oversight or supervision.

### ii.   Patient 3

165.   Medicaid Patient 3 is another example of unreasonable and unnecessary (and worthless) drug testing for which LabCorp received reimbursement from Medicaid.

166.   On January 27, 2014, NGHCC saw Patient 3, who requested "med refills."  An NPP, rather than a physician, saw the patient and documented in the medical record that Patient 3 suffered from chronic pain and anxiety and prescribed 3 highly addictive opioids, including Percocet (a DEA Schedule II oxycodone drug and one of the more common drugs that can cause an opioid addiction), Norco (another DEA Schedule II drug that represents a hydrocodone combination drug), and Xanax (a DEA Schedule IV drug).  Dr. Smith's electronic signature appears on the patient's medical record three months later, on March 17, 2014.

167.   On February 25, 2014, Patient 3 was seen by a non-medical staff person for pain management and a rash on her back.  At that appointment, she was

prescribed 5 mg/325mg of Norco (a combination of hydrocodone acetaminophen and bitartrate that is highly addictive) and daily Xanax (a DEA Schedule IV drug). Dr. Smith did not see the patient, but his signature appears electronically on the patient's medical record three weeks later, on March 17, 2014, the same date that his electronic signature was applied to the medical records for both visits—the January and February visits.

168.   On October 28, 2014, Patient 3 was seen for pain management. According to her medical record, Patient 3 "needs a new referral to pain management, old one shut down." During this visit, she received prescriptions for Klonopin (a DEA Schedule IV drug) and Percocet (a DEA Schedule II narcotic). Once again, although Dr. Smith did not see the patient, his electronic signature appears on Patient 3's medical record.

169.   On January 7, 2015, Patient 3 returned to NGHCC with one request— "follow up on med refills"—for which she received more prescriptions for Klonopin/Norco and Percocet. Although the medical record does not show that Dr. Smith saw Patient 3, his signature appears on her medical record one week later, on January 14, 2015.

170.   Over the next two years, at almost every monthly visit of Patient 3 through August 2016, NGHCC prescribed refills of some combination of Percocet,

Klonopin/Norco, and Xanax. And, within the first year, another drug called gabapentin was added to Patient R.C.'s list of prescriptions. (According to the American Addiction Center, gabapentin is not commonly thought of as a drug of abuse and is not on the list of controlled substances; however, it has properties that are similar to many commonly abused intoxicants and has been known to produce withdrawal symptoms and psychoactive effects.) Each time, Dr. Smith's signature has been affixed to the medical records days or weeks after the visits by Patient 3.

171. It does not appear from the medical records for Patient 3 that Dr. Smith ever saw Patient 3 even though Patient 3 was being routinely prescribed addictive drugs. In fact, at one visit in June 2015, with no change in medical history noted in Patient 3's medical record, NGHCC staff increased Patient 3's prescription for Percocet to 10 mg from 7.5 mg, to be taken once every 6 hours.

172. On December 14, 2017, Patient 3 complained of left shoulder pain that "occurs occasionally and is stable," "is aggravated by lifting and pushing," and "is relieved by pain/RX meds," and Oxycodone. Oxycodone, a DEA Schedule II drug, is added to her already large plate of prescription drugs. It appears from the signature in Patient 3's medical record that NPP Person C saw Patient 3 on this visit. There is no indication in the medical record that Dr. Smith saw Patient 3.

173. NPP Person C continued to order Oxycodone and Xanax prescriptions

for Patient 3 every month through at least March 2018.

174.    The medical records showed that NPP Person C ordered Patient 3's lab work for initial screens of a large slate of opioids every 1 to 3 months, as per LabCorp's protocol.  There is no documented reason from a physician for these repeated drug tests of Patient 3, particularly for drugs NGHCC was prescribing. Patient 3 serves as another example of LabCorp testing patients for the same panoply of opiates at 1 to 3-month intervals.

175.    All of this excessive and worthless testing for Patient 3 was either not helpful or detrimental to Patient 3's well-being.  Testing for expected results overwhelmed the provider (and LabCorp) with unnecessary test results for patients, including Patient 3.  The problem was compounded by the lack of physician orders for the tests because, in the absence of physician involvement, test results were not reviewed for evaluation and treatment.

176.    For LabCorp, the drug testing is largely performed for billing purposes. Dozens of claims (CMS Form 1500s) were submitted by Defendants on behalf of Patient 3 for her medical services and corresponding lab tests and Medicaid paid these claims.

### iii.    Patient 7

177.    Medicare Patient 7 is an example of unreasonable and unnecessary (and

worthless) drug testing for which LabCorp received repeated reimbursements from Medicare.

178.   On March 8, 2017, LabCorp billed Medicare for Patient 7 when drug testing was not documented as reasonable and necessary.  Patient 7 was tested for such common drugs as naproxen (commonly known as Aleve or other types of ibuprofen) and salicylate (a type of chemical acid commonly found in products to treat dry skin and dandruff like Selsun Blue).  LabCorp also tested for a slate of opioid drugs including heroin and cocaine for which Patient 7 tested negative.

179.   On May 10, 2017, LabCorp tested Patient 7 for acetaminophen (Tylenol), which Patient 7 reported he was taking before he was tested.

180.   On November 29, 2017, LabCorp tested Patient 7 for a larger slate of opioid drugs than he was tested in March of that year, which was reimbursed by Medicare at an even higher rate.  Patient 7 tested negative again for opioids

181.   On January 3, 2018, January 31, 2018, and April 25, 2018, LabCorp again tested Patient 7 for a large slate of opioid drugs.  Patient 7 tested negative again, except for the presence of hydrocodone, which Patient 7 was being prescribed.

182.   There is no documented reason for these repeated drug tests of Patient 7.

183.   Patient 7 serves as an example of LabCorp testing patients for the same

panoply of opiates at 1 to 3-month intervals, as a matter of course and without medical necessity.

184.   LabCorp also routinely billed for confirmatory tests when, by its own published standard, such tests were unnecessary.

185.   For instance, the results of every lab test for Patient 7, found positive traces of hydrocodone.   That positive result was expected because Patient 7 was being prescribed hydrocodone.   Despite this expected result, LabCorp billed the health care programs for a confirmatory test.   A confirmatory test for hydrocodone for Patient 7 was not reasonable and necessary.

186.   By contrast, Patient 7 tested negative for alprazolam (Xanax). This result was unexpected, because Patient 7 had been prescribed Xanax since January 2016.   Yet, the provider and LabCorp missed this test result and continued to prescribe Xanax to the patient, leading to the possibility that Patient 7 was free to distribute this addictive drug to others (because he wasn't using it).

187.   In this example, LabCorp excessively billed for initial drug screens and confirmatory tests of expected drugs in Patient 7, even though such test results had no significance to the patient's medical diagnoses or treatment—such tests are not reasonable and necessary.   Yet, when unexpected test results showed that Patient 7 tested negative for Xanax, which Patient 7 was prescribed for the last year, neither

LabCorp nor any physician addressed those results with Patient 7 or stopped prescribing Xanax to the patient.

188.   The reward for LabCorp is realized by this example.  Through positive results for expected tests, LabCorp increased its chance of avoiding red flags of unnecessary testing being raised with the regulators.  And, LabCorp is guaranteed an income stream.

189.   All this unnecessary, excessive and worthless testing for Patient 7 was paid by Medicare.

### iv.   Patient 8

190.   Medicaid Patient 8 is another example of excessive, unnecessary and worthless drug testing for which LabCorp received reimbursements from Medicaid.

191.   Patient 8 was a patient of NGHCC since at least January 2018.  The medial records for Patient 8 show that NGHCC wrote prescriptions for him for oxycodone (Percocet) (a DEA Schedule II drug) and alprazolam (Xanax) (a DEA Schedule IV drug for chronic pain symptoms).

192.   During a March 7, 2018 office visit, NGHCC ordered four lab panels for Patient 8, including a comprehensive metabolic panel testing for 14 types of drugs, a hemoglobin A1C test (Patient 8 was diabetic), a lipid panel, and a compliance drug urinalysis (urinalysis drug screen).

193.   The LabCorp urinalysis drug screen was sent to a laboratory in St. Paul, Minnesota for interpretation and the generation of a written report.  The tests results showed the presence of an unexpected drug, doxepin—a drug used to treat insomnia and depressive disorder.  However, another drug—oxycodone—was not detected, although it had been prescribed to Patient 8.

194.   Based on Patient 8's medical record, LabCorp collected additional urine samples from the patient in January and February 2018—consistent with LabCorp's practice of performing routine initial drug screens on a monthly basis without medical necessity—although the test was not performed due to an insufficient sample amount.

195.   After the March 2018 office visit, NGHCC prescribed another DEA Schedule IV drug to Patient 8—Tramadol.

196.   On April 4, 2018, the medical records show that Patient 8 was seen by LPN Person D who was not credentialed under the Medicare program.

197.   Patient 8's prescriptions for oxycodone, Xanax, and tramadol were continued.

198.   Four days later, on April 8, 2018, Patient 8 was admitted to the hospital.

Patient 8 Hospital Record

199.   The hospital record documented:

> The patient has been hospitalized 28/29 times in the last 6 years for polypharmacy related syncope and altered mental status.  He continues to be on high doses of daily Xanax, Flexeril, tramadol, and Percocet and has been known to have frequent problems with regards to unintentional medication overdose.

200.   In the hospital's assessment and plan, the hospital documented:

> The patient is lethargic, has slurred speech, and his behavior is consistent with being "under the influence" of multiple [] medications.  For now will begin by decreasing patient's Xanax does, decrease Flexeril dose, discontinuing tramadol, and decreasing Percocet dose.

201.   Defendants repeatedly billed Medicaid for excessive, unnecessary and worthless lab services for Patient 8.  Yet, they failed to properly treat Patient 8's serious substance abuse problems and continued to prescribe him addictive drugs, leading to hospitalization.

### B.   NGHCC Executed Sham Partnerships with Specialty Providers to Obtain Federal FQHC Grant Money that was Used to Facilitate a Kickback Scheme

202.   NGHCC executed sham partnerships with specialty providers to obtain federal grant money for the provision of specialty services to its patients (i.e., dental, pediatric, behavior health).  The grant money did nothing more than fund a kickback scheme between NGHCC and the specialty providers, creating a one-way referral stream from the specialty providers to NGHCC.  However, the Medicare and Medicaid patients were the losers because they never received the benefit of the

specialty services.

## 1. NGHCC's Participation in the FQHC Program

203.   On information and belief, NGHCC applied and certified itself as a Federally Qualified Health Center (FQHC) in 2016.

204.   An FQHC is a community-based health care provider that receives oversight from HHS's Health Resources & Services Administration (HRSA) to provide     primary     care     services     in     underserved     areas. https://www.hrsa.gov/opa/eligibility-and-registration/health-centers/fqhc/index.html     FQHC's are authorized by 42 U.S.C. 1396d § 1905(l)(2)(B).

205.   FQHCs are facilities that furnish services in an outpatient clinical setting to a federally designated medically underserved area or population.  Federal Register, Volume 79, No. 85 (May 2, 2014) at 25438.

206.   FQHCs are intended to be safety net providers furnishing primary health and qualified preventative health services.  CMS Medicare Learning Network, Federally Qualified Health Center (Jan. 2018).

207.   To qualify as a FQHC, the health care entity must be receiving federal grant money pursuant to the Public Health Service Act, 42 U.S.C. § 254a.

208.   For instance, according to its website, NGHCC received U.S.

Department of Agriculture ("USDA") grant funds that helped NGHCC become eligible to be certified as a FQHC.

209.   That grant money is subject to specific requirements and restrictions. *See* 42 U.S.C. § 254b-1.

210.   As of October 1, 2014, FQHCs are paid by the government-insured programs on a prospective payment basis instead of a lump sum amount per beneficiary visit.

211.   The HRSA administers and has oversight of the FQHC program.

212.   FQHCs are subject to specific regulatory scheme and are required to fulfill particular requirements in order to remain eligible for the FQHCs federal funds disbursed by HRSA.

213.   For instance, FQHCs are required to offer a sliding fee scale to persons with incomes below 200 percent of the Federal poverty level.   CMS Medicare Learning Network, Federally Qualified Health Center (Jan. 2018).

214.   FQHC visits must be "medically necessary face-to-face medical or mental health visits or a qualified preventive health visit between the patient and the physician, NP, PA, CNM, CP, or CSW during which time one or more qualified FQHC services are furnished."   CMS Medicare Learning Network, Federally Qualified Health Center (Jan. 2018).

64

## 2. NGHCC Had Sham Partnerships with Specialty Providers

215.   NGHCC executed sham partnerships with specialty providers to certify its purported compliance with FQHC grant applications.  Those grant moneys, in turn, helped facilitate a kickback scheme, but at the expense of NGHCC's patients.

216.   The crux of the fraudulent scheme is that NGHCC engaged in unlawful kickback arrangements with specialty groups such as dental, pediatric, and behavioral counseling providers for the provision of services to NGHCC patients to obtain federal grant money for providing these services to their patients.  While the kickback scheme generated a steady stream of referrals from the specialty providers to NGHCC, for which the specialty providers were paid from the federal grant monies, NGHCC did not send its patients to the specialty providers.  Therefore, the partnerships were a sham but allowed NGHCC to obtain the grant money. And, NGHCC patients did not receive the specialty services they were entitled to receive.

217.   NGHCC fraudulently advertised its capability to furnish dozens of services but NGHCC either did not have the personnel, expertise, facilities or partnerships to render such services, or had sham arrangements for the services. http://www.nghcc.com/services/

218.   Here is a snapshot of misleading statements of services NGHCC claimed to offer patients from its website.

Services
Family/Internal Medicine          Patient Medicine Assistance
Occupational Medicine             Pharmacy
Dentistry                         Behavioral Health
Pediatrics                        Education Programs
Physical/Aquatic Therapy          Women's Health

Family/Internal Medicine
Acute and Chronic Healthcare
Health problems related to aging
Specialized weight management and diabetic programs
Monitoring and follow-up
Physician one-on-one education
Referrals for on-going counseling of health problems

Occupational Medicine
Education in preventive and occupational medicine in collaboration with local and
public health departments
Case Management
Workers Compensation
Occupational Fitness

Dentistry
NGHCC is partnered with Dr. Jason Webb, DDS to fulfill our patients dental
needs. Check out his new facility at 7102 Nashville St in Downtown Ringgold.
Cleanings and preventive care
Fillings
Extractions
Dentures
X-rays
Cosmetics
Oral Cancer Screenings

Pediatrics
NGHCC is proud to partner with Promise Pediatrics for the preventive care and
immunization needs of our pediatric patients. NGHCC offers any other medical
care for pediatric patients.

66

Physical/Aquatic Therapy
Orthopedic Injury
Sports Injury
Arthiritis/Osteoperosis
Spinal Care
Post Surgical Rehab
Geriatric Care
Fall Prevention
Postural and Balance Analysis

Patient Medicine Assistance Program
NGHCC is pleased to be in assistance with Curant Health Medication management
program. This program provides personalized medication management services to
our patients that qualify.
Specialty pharmacist and pharmacy techs to provide 24/7 medication management
Dedicated patient care coordinators
Free, convenient home medication delivery

NGHCC also offers our own In-House Pharmacy which offers
Drive-Thru services
Pharmaceutical Assistant programs
Low cost prescriptions

Behavior Health
NGHCC has referral privileges with Lookout Mountain Community Services for
all of our patients with behavioral health needs. Lookout Mountain Community
Services is an adult mental health facility with a wide range of behavioral and/or
psychiatric disorder services.
Individual/Group/ and Family Therapies
Case Management
Addictive Disease Support Services
Psychosocial Rehabilitation
Peer Support Program
Supported Employment

Women's Services
Annual Physicals

Breast Exams
Hormone Replacement Therapy

NGHCC is proud to be partnered with multiple specialty offices that offer
continued care for any issues that may arise
Chattanooga Women's Specialist
Battlefield Imaging
Susan G. Komen

Education Programs
Weight Challenge Classes/Programs
Cardiovascular Education
Diabetes Program and Classes
General Nutrition Classes
Comprehensive Wellness Programs

219.   Dr. Smith, the sole physician at NGHCC, is a family medicine

practitioner.  Dr. Smith could never have properly furnished the specialty services

that were subject of these grants.  None of the other NPP medical staff were

qualified to render these specialty services, either.

220.   NGHCC through CEO Hunter certified that NGHCC had meaningful

partnerships with specialty practice groups such as dental, pediatric and behavioral

counseling providers for some of these services when it did not.  Thus, patients

were not referred to these service providers.

221.   Yet, CEO Hunter made express false certifications on the grant

applications to the contrary.  NGHCC, certifying itself as a FQHC, received

millions of dollars in grant money while failing to comply with material

requirements of participating in the program.

222. For example, NGHCC applied for and received a grant to provide dental services. To qualify for this grant, NGHCC certified that it contracted with specialty providers –Wee Care Dental and Webb Dentistry – to provide dental services to NGHCC patients. These arrangements between Wee Care Dental and NGHCC and Webb Dental and NGHCC were in writing. Wee Care Dental and Webb Dental agreed to either offer the discounted sliding fee scale that NGHCC provided or another form of discount to NGHCC patients. As part of the arrangement to refer patients to these dental providers for discounted rates, Wee Care Dental and Webb Dentistry agreed to refer NGHCC patients back to NGHCC for any medically necessary follow-up treatment or monitoring.

223. Defendants also falsely represented that NGHCC had used government funds to purchase a software program to use with dental providers and a bus to transport patients between NGHCC and the dental providers. In fact, NGHCC never purchased the software program and never used the bus it purchased with government funds to transport patients.

224. NGHCC had similar arrangements with other specialty providers such as Promise Pediatrics for pediatric services and Georgia H.O.P.E. for substance abuse treatment and behavioral counseling services. These services were not

69

provided to patients, however.

225.   The unlawful referral stream was one-way.  So, while the specialty providers referred their patients to NGHCC, in exchange for kickback payments from the grant funds, NGHCC patients did not receive the benefit of the specialty services, despite CEO Hunter's certifications to the contrary.

## C.    Defendants Fraudulently Billed for Unqualified and Uncredentialed NGHCC Staff Who Failed to Provide Patients with Serious Medical Conditions the Treatment They Needed.

226.   As early as 2009, Defendants billed the government-insured health care programs, including Medicare and Medicaid, for unqualified and uncredentialed staff—mid-level providers or NPPs, such as Physician Assistants (PAs) and Nurse Practitioners (NPs), medical liaisons, and medical students—who were not enrolled in Medicare or Medicaid and were not supervised by an enrolled and credentialed physician.

227.   As a result, NGHCC patients did not receive the proper care or treatment they deserved.  Patients with serious medical conditions such as chronic pain, addiction, and depression often did not have the benefit of face-to-face medical or mental health visits with a physician or a properly supervised NPP.  In many instances, these patients were being prescribed addictive drugs, including opiates, by unsupervised staff.  Several unsupervised and uncredentialed NPPs,

including Person C, wrote prescriptions for patients without a physician's order or review.

228.   Early during Relator's tenure, a Georgia state official with the Georgia Primary Care Association (GPCA) that provides oversight of FQHCs, when conducting an in-house audit, spoke with Relator about NGHCC's billing practices.  The official raised at least four issues that she found troubling: (a) that NGHCC was only billing under a single provider number for Medical Director Smith, (b) that providers were not properly credentialed, and (c) that Dr. Smith was the only supervising physician at the facility, and (d) that, as the only supervising physician, Dr. Smith was present at the facility no more than once per week, at most.  The state official cautioned Relator and the CFO that these were serious violations of Medicare and other insurers' requirements.  Email from Relator to NGHCC Management Re: Medicare Compliance Information 3-2-2018.  Relator continued to raise the same concerns as were raised by the Georgia state official during her tenure at NGHCC with Defendants and NGHCC's CFO and Deputy CEO, to no avail.

229.   To bill Medicare and Medicaid for services, Defendants had two methods through which they could have properly cared for patients and billed the federal healthcare programs.

71

230. First, NGHCC could have credentialed or enrolled their NPPs in the Medicare and Medicaid programs and billed those services under its provider number. Alternatively, NGHCC could have billed for the services provided by NPPs "incident to" the single credentialed physician Dr. Smith, if Dr. Smith supervised the NPPs, as required by the federal and state health care programs.

231. The federal health care programs reimbursement rates are different based upon whether the services are rendered by a physician or by a credentialed NPP. If the physician provides the service, the federal health care program reimburses the provider at 100 percent of the claim. If an NPP properly provides the medical care, the federal health care program reimburses at a rate of 85 percent. Medicare Claims Processing Manual, Chapter 12 – Physicians and Nonphysician Practitioners.

232. To enroll in the Medicare and Medicaid programs, all physicians and NPPs are required to submit Enrollment Applications to CMS. *See* Medicare Enrollment Application, Form CMS-855I.

233. This application includes a certification that the provider will abide by all applicable Medicare and Medicaid laws, regulations, and program instructions, and states in relevant part:

> 4. I agree to abide by the Medicare laws, regulations, and program instructions that apply to me or the organization

72

> listed in Section 4A of this application. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.
>
> 7. I understand that the Medicare identification number issued to me can only be used by me or by a provider or supplier to whom I have reassigned my benefits under current Medicare regulations, when billing for services rendered by me.
>
> 8. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*See* Medicare Enrollment Application, Form CMS-855I, Section 15

(Certification Statement).

234. Properly enrolled physician and NPPs must then submit claims for services they render on the CMS Form 1500, which requires providers to certify that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision."

235. Providers further certify when enrolling in Medicare and Medicaid that

they will not make any false statements or misrepresentations, or cause others to make false statements or misrepresentations of material facts concerning payment requests. *See* 42 U.S.C. § 1230a-7b(a)(1)-(2).

236. Once physicians and NPPs are properly enrolled or credentialed in the Medicare and Medicaid programs, they can render services for Medicare and Medicaid patients.

237. Alternatively, NPPs can bill for services as "incident to" a credentialed physician. Billing as "incident to" allows providers to seek 100 percent of the claim reimbursement, while billing to the NPP's provider number only entitles the practice group to 85 percent of the claim reimbursement. Medicare Claims Processing Manual, Chapter 12 – Physicians and Nonphysician Practitioners.

238. "Incident to" billable services mean that an NPP can perform the service for the patient, provided that the credentialed physician directly supervises the service. Medicare Claims Processing Manual, Chapter 12 – Physicians and Nonphysician Practitioners.

239. Direct supervision requires the credentialed physician to "be present in the office suite to render assistance, if necessary." Medicare Claims Processing Manual, Chapter 12 – Physicians and Nonphysician Practitioners at 30-31.

240. Further, to qualify a service as "incident to," "services must be part of

74

[the] patient's normal course of treatment, during which a physician personally performed an initial service and remains actively involved in the course of treatment." CMS Medicare Learning Network, Matter No. SE0441 (Aug. 23, 2016).

241.   NGHCC knew of the importance of credentialing medical staff who rendered and billed for providing medical services to patients, memorializing the specific requirements in a written company policy entitled "Credentialing," that stated that NGHCC must verify its employees' Medicare and Medicaid numbers.

242.   Defendants, however, failed to satisfy either requirement to bill for NPP rendered services: to bill as credentialed or enrolled NPPs, or to bill as "incident to" Dr. Smith's supervision.

243.   None of the NPPs at NGHCC were enrolled or credentialed in any of the federal health care programs, and NGHCC, CEO Hunter and Medical Director (Dr.) Smith were well aware of that fact.

### 1. Medical Director Dr. Smith's Provider Number was Fraudulently Used for Billing

244.   The services that these NPPs were performing were being billed to the only credentialed physician in the practice, Medical Director Dr. Smith.

245.   Dr. Smith's primary practice, however, was not at NGHCC.  He worked full time at another family practice over an hour's drive from NGHCC— Menlo Family Medicine, PC in Menlo, Georgia, as he certified.

246.   Dr. Smith saw patients at NGHCC one day per week, and often less despite his attestation that: "I see patients here at least one day a week on a regular basis.

247.   Dr. Smith provided little to no supervision of NGHCC medical staff who operated the facility and performed medical services five days a week.  It was a physical impossibility given his responsibilities elsewhere.  NGHCC's appointment book and calendar identified certain days during the week when Dr. Smith was outright "unavailable."

248.   However, despite Dr. Smith's absence from NGHCC, his electronic signature appears on patients' medical records in high-volume, and usually days or weeks after the patients had been seen by another staff member at NGHCC.

249.   Relator does not believe that Dr. Smith reviewed even the patients' medical records before he (or someone on his behalf at NGHCC) affixed his electronic signature to all these records.

250.   Relator is aware of numerous instances in which CEO Hunter instructed staff to affix Dr. Smith's electronic signature to medical records before submitting those related claims to the government-insured health care programs, including Medicare and Medicaid.

251.   These services were improperly billed to the government-insured

76

health care programs because Dr. Smith either did not render the service or the service was not incident to his supervision.

252.   As another example, on May 10, 2017, Relator challenged management (to no avail) when they had planned to conduct and bill for lab health screens at an off-site fair, notifying the CFO, "I do not believe that we can bill anything without being at our facility and with all the documentation necessary. *Plus, Dr. Smith isn't there.*  We don't have any RNs who are credentialed.  [Person C] isn't.. . . . But, understand that with any procedure (lab) there are risks involved that would put us at risk if we do not have the proper documentation . . . Not to mention, Incident To guidelines to be met." (emphasis added).

253.   Even more egregiously, for a time in 2017, Dr. Smith himself was uncredentialed, yet Defendants knowingly used his provider number to bill Medicare on behalf of patients.

254.   Documents show that Dr. Smith had not completed his recredentialing paperwork, and NGHCC knew that "Dr. Smith should not see any Medicaid patients at all."  Yet, during this time when his credentials had lapsed, Dr. Smith was listed as the rendering provider on most or all claims submitted to the government-insured health care programs, through at least March 2018.

255.   Further, as an FQHC, NGHCC was aware that it was required to

provide annual wellness visits to patients by properly credentialed staff.   Medicare

Learning Network, "The ABCs of the Annual Wellness Visit," (April 2017).

Medicare reimburses FQHC entities for annual wellness visits at an average of $150

per visit.

258.   An annual wellness visit was required to be a face-to-face encounter

with a "physician, nurse practitioner (NP), or physician assistant (PA)." Medicare

Learning Network, "The ABCs of the Annual Wellness Visit," (April 2017).

257.   However, at NGHCC, RNs and LPNs were regularly performing

annual wellness visits with no involvement by a physician, let alone a face-to-face

encounter with a physician, NP, or PA.

### 2. Examples of Unqualified and Uncredentialed Providers Treating Patients and Fraudulently Billing the Federal Health Care Programs

258.   For nearly all staff who performed medical services on behalf of

patients, including the NPPs, for whom NGHCC billed the government-insured

health care programs, there is no documentation or evidence that they were ever

enrolled or credentialed in any of the federal health care programs.

259.   Below are examples of NGHCC allowing its non-credentialed medical

staff to care for and treat patients with serious conditions, prescribe drugs, including

addictive ones, and fraudulently billing the federal health care programs, including

Medicare and Medicaid, as if the services had been properly provided and billed for

78

by Medical Director Dr. Smith.

### i.   Staff Person C

260.   On November 2, 2015, NGHCC hired Person C to act as a physician assistant.   Person C took a predominant role in the practice, assuming the responsibility for rendering services for hundreds of patients.   However, NGHCC failed to require that he become properly credentialed under the Medicare and Medicaid programs, even over a year and a half after he was hired, all the while he was caring for patients.

261.   It wasn't until June 1, 2017, that Person C was properly credentialed under the Medicare and Medicaid programs.

262.   During this time, Defendants fraudulently billed the federal and state health care programs for services performed by Person C when he was neither a credentialed NPP who could bill through NGHCC's provider number nor "incident to" the supervision of Dr. Smith.

263.   Even once Person C was properly credentialed in June 2017, NGHCC continued to fraudulently bill the federal and state health care programs for Person C's services by improperly using Dr. Smith's billing number instead of Person C's billing number to receive inflated amounts of reimbursement.

264.   By using Dr. Smith's billing number for services provided by Person

C, NGHCC was reimbursed at 100 percent of the claim, rather than at the 85 percent reimbursement rate that is allowed for NPPs.

### a) Patient 9

265.   For example, Person C saw Medicare Patient 9 on December 21, 2017, for chronic pain, including back pain, and family planning.

266.   According to the medical records for the visit, Patient 9's "[s]ymptoms are relieved by pain meds/drugs. . . . pt has been out of pain management since 2013. Currently managing back pain with Tylenol and percocets that she sometimes gets from her friend."

267.   NPP Person C documented that "Pt takes percocets at times that she gets from her friend.  Discussed in avoiding other people's meds," and then continued to prescribe Klonopin and Phentermine, both drugs listed on the DEA's Schedule IV, for Patient 9.

268.   Person C signed Patient 9's medical record, and there is no documentation in the medical record that Dr. Smith provided the required supervision.

269.   Yet, NGHCC billed Medicare for these medical services provided by an NPP for 100 percent of the claim using Dr. Smith's provider number and Medicare paid the claim.

80

### b) Patient 10

270.   As another example, NPP Person C saw Medicaid Patient 10.  On the Medicaid health insurance claim form for Patient 10, Person C was fraudulently identified as having the title of "DN" or Doctor of Nursing.  Person C did not have a Doctor of Nursing.

271.   There is no documentation in the medical record that Dr. Smith provided the required supervision.

272.   Yet, NGHCC billed Medicaid for these medical services provided by an NPP for 100 percent of the claim using Dr. Smith's provider number and Medicaid paid the claim.

### ii.   Staff Person E

273.   On March 15, 2016, NGHCC hired Person E, a Doctor of Osteopathic Medicine (D.O.). Person E cared for patients for almost a full year before NGHCC required that he obtain proper credentialing under the Medicare and Medicaid programs.

274.   It wasn't until January 4, 2017, that NGHCC submitted Person E's Medicare enrollment application and January 9, when CMS received it.

275.   Person E's application was incomplete, and it wasn't until April 7, 2017 that CMS confirmed that it had received additional information to process the

81

request on behalf of Person E.   All the while, Person E continued to care for patients and improperly bill the federal health care programs until he was properly credentialed in late 2017.

276.   Documents show that Defendants were aware that as of October 10, 2017, Person E was still not properly credentialed by the federal health care programs to provide services to patients and bill the federal health care programs on their behalf.   Yet, Person E continued to care for patients at NGHCC and NGHCC billed for his services under Dr. Smith's provider number.

277.   It wasn't until at least the latter half of 2017 that Person E was approved as a Medicare and Medicaid enrollee and allowed to provide (and bill for) health care services for patients at NGHCC.

278.   Accordingly, from at least March 15, 2016 through the date when Person E was properly credentialed, Defendants were knowingly submitting false and fraudulent claims to government-insured programs.

279.   During the time that Person E was rendering care to and billing on behalf of patients when he was not credentialed, Defendants improperly billed the Medicare and Medicaid programs for his services by using Dr. Smith's provider number.   All claims submitted in this matter were false or fraudulent claims.   There are no circumstances under which a physician can bill "incident to" another

physician with the exception of a "locum/tenens arrangement," which this circumstance did not qualify for. Medicare Claims Processing Manual, Chapter 1- General Billing Requirements at 67 (Section 30.2.11).

### a) **Patient 11**

280. As one example, on January 2, 2017, Person E rendered services to Florida Medicaid Patient 11, as documented on the patient's superbill used to support the claims billed to Medicaid. During that visit, Person E treated Patient 11's back pain by prescribing 3 DEA Schedule IV opioids – Tranxene, Tramadol, and Xanax – and at least one other medication known as Buspirone to treat her anxiety.

281. On January 4, two days after Person E saw Patient 11, Dr. Smith (or someone on his behalf) electronically signed Patient 11's medical record, even though Dr. Smith was not in the office on January 2, to see Patient 11.

282. The Medicaid claim on behalf of Patient 11 was fraudulently billed as if Dr. Smith had seen the patient, and Medicaid reimbursed NGHCC $108.70.

### b) **Patient 12**

283. In another instance, on February 7, 2017, Person E treated Medicaid Patient 12, according to the superbill that supported the Medicaid claims billed on her behalf and paid by Medicaid.

284.   The Medicaid claim on behalf of Patient 12 was fraudulently billed as if Dr. Smith had seen the patient and Medicaid reimbursed NGHCC $111.92.

285.   Defendants fraudulently billed the federal and state health care programs for services performed by Person E during the time he was not a credentialed physician and fraudulently used Dr. Smith's provider number for billing.

### iii.   Staff Person F

#### a)   Patient 13

286.   On December 28, 2017, Medicaid Patient 13 was seen by Registered Nurse, Person F, who was not credentialed by the Medicaid program.  Patient 13 complained about "sharp pain in [her] back."

287.   Based upon NGHCC's appointment schedule, Dr. Smith was not in the office on December 28, 2017, when Person F treated Patient 13.

288.   Without physician-supervision, Person F took a history and performed a physical of Patient 13 and documented that: "[s]ymptoms are relieved by pain meds/drugs and rest. . . . Patient states she has been waiting to get into pain management for a while."

289.   The medical record also reflects on December 28, that Patient 13 stated that "her back pain has worsened over the past week due to sleeping on the floor at

a friends house recently, radiates down left leg."

290.  Patient 13 requested Toradol – a pain medication that while not characterized as an addictive narcotic is a strong anti-inflammatory drug that is intended for short-term treatment.

291.  Person F ordered Patient 13 Ketorolac (generic name for Toradol), ordered 5 drug tests to be performed and billed by LabCorp, and signed the Medicaid superbill, even though she was not credentialed to perform services that could be billed to Medicaid.

292.  Dr. Smith (or someone on his behalf) electronically signed the patient's medical record on January 19, 2018, three weeks after Patient 13 was seen by Person F, allowing NGHCC to bill (improperly) Medicaid on behalf of the patient and Medicaid paid the claim.

293.  The Medicaid claim form (1500) for the December 28, 2017 patient encounter fraudulently stated that Dr. Smith was the rendering provider for Medicaid claims submitted for reimbursement on behalf of Patient 13.

294.  Medicaid reimbursed NGHCC and Dr. Smith $113.93 for those false claims.

### b)     Patient 14

295.  In another example, on December 28, 2017, Person F saw Medicaid

85

Patient 14. The medical record reflects that Patient 14 suffered from depression and diabetes.

296. The medical record shows that Patient 14 was prescribed klonopin, a DEA Schedule IV substance, Clonazepam, another DEA Schedule IV substance, and at least two other anti-depressant medications.

297. Person F ordered numerous lab tests to be performed and billed by LabCorp.

298. Although Dr. Smith was not in the office on December 28, 2017, he (or someone on his behalf) signed the medical record on January 19, 2018 – three weeks later.

299. The Medicaid Claim form (1500) for the December 28, 2017 patient encounter fraudulently stated that Dr. Smith was the rendering provider for Medicaid claims submitted for reimbursement on behalf of Patient 14.

300. Medicaid reimbursed NGHCC and Dr. Smith $111.93 for those false claims.

**D.     Defendants Knowingly Failed to Properly Treat Patients Suffering from Opioid Abuse and Overprescribed Dangerous Drugs to its Patients, Resulting in Patient Harm and Even Patient Deaths**

301. NGHCC and the named individuals submitted (or caused the submissions of) thousands of claims for patients who were taking opioids and

patients who were diagnosed with opioid abuse or dependence.

302.  LabCorp's   unlawful   inducements   and   excessive,   medically unnecessary, and worthless testing were knowingly false and fraudulent.

303.  Defendants' collective conduct and conspiracy led to patient harm, including patient deaths.  The patient examples alleged in this Complaint are just the "tip of the iceberg."  There are many patients who were suffering from opioid addictions but received improper care due to the combined fraudulent conduct of all Defendants.  Local hospitals, including Park Ridge East Hospital, Park Ridge Main Hospital, and Hamilton Medical Center, expressed anger and alarm that NGHCC patients were being admitted to their hospitals suffering from opioid overdoses based on prescriptions written by NGHCC staff.  Sometimes hospital staff demanded to speak with Medical Director Dr. Smith—the only credentialed physician—with no success, since Dr. Smith was rarely on-site.  These calls were usually handled by NGHCC front office staff who were not medical professionals.

304.  Defendants were aware of the numbers of patients who were taking opioids and other addictive drugs and that NGHCC was ill-equipped to provide reasonable and necessary services that these patients were entitled to receive.

305.  Patient 15 is one example of a patient death.

306.  Patient 15 was a 46-year-old Medicaid patient who was being seen and

87

treated by NPP Person C with little to no oversight by Dr. Smith.

307.   NPP Person C refilled Patient 15's prescriptions for narcotics on December 28, 2017 even though it appeared Patient 15 was abusing opioids.

308.   On January 25, 2017, the medical records show that Patient 15 was seen by NPP Person C and again "returns today for office visit, medication refill, and to discuss further management plans.

309.   NPP Person C notated in Patient 15's medical record:

> Patient returns for scheduled office visit and to discuss further management of HPI.  Since last office visit, no significant changes in health status, no recent ED visits or hospitalizations.  No new medications prescribed from other providers.  She is very upset about the death of a close friend who was shot by her husband while driving in the car together.  It was on national news and is very distraught over the incident.  She cannot stop thinkin [sic] about the incident.  She is also very upset about the fact that she and her husband are being evicted from their home, lost employment and is unable to obtain governement [sic] assistance at this time.  Husband is physically impaired also.

310.   Again, NPP Person C refilled Patient 15's prescriptions for narcotics.

311.   Dr. Smith's electronic signature was appended to the record on February 1, 2017.

312.   Patient 15 returned to NGHCC on January 27, 2017 with the same concerns.  NPP Person C notated on this visit:

> 1) Overall the patient is extremely distraught over several
> personal and financial situations. 2) I allowed the patient
> to vent and discussed options for assistance.  3) She is
> not willing to contact her family and asked for assistance.
> 4) Gave her community agency numbers.

313.  NPP Person C further documented that Patient 15's "pain [is] well-controlled on current medications; Rx provided today; follow up in 1 month for reevaluation and new Rx if required."

314.  NPP Person C then refilled prescriptions for oxycodone (a Schedule II drug), Xanax (a Schedule IV drug), Soma (a Schedule IV drug), gabapentin and Seroquel (opioid-like drug with addictive qualities).

315.  Staff at NGHCC's front desk were notified that Patient 15 died after overdosing on oxycodone later that day, which NGHCC staff had earlier prescribed.

316.  Defendants were well aware that they were over prescribing, or improperly prescribing, dangerous drugs well before Patient 15's death.  From meeting minutes in September 2016:

> [CEO] Delaine [Hunter] spoke with [Medical Director]
> Dr. Smith regarding issues we are having **with patients
> seeking medications and refills that have nothing to
> do with family practice.** [] and [] are currently creating
> a worksheet to assist in determining which patient we are
> going to release from the practice.  Once the information
> is obtained, [Person C], Dr. Smith, [], [Person K],
> Delaine, as well as possibly staff that are familiar with
> the patients, will sit down and determine which patients
> are legitimately here for family practice care and which

> ones are just people seeing drugs.  System all drug
> screens and all scripts that have gone out the door
> January 1 – present. . . .  The guidelines for releasing
> patients will be measured by the following questions:
> Who the patient is?  What they are coming here for?  Are
> we doing family practice care?

317.   Despite this knowledge, no material changes to their prescribing
practices were made after this meeting.  Instead, the problems grew worse.

318.   Pharmacy scripts written and filled grew by 44 – 51 percent in a
single year.

> Pharmacy script numbers for January 2016 year total
> 1159, script numbers for January 2017 year total 1667.
> This is an increase of 44%.  340B scripts for January
> 2016 year total 508, scripts for January 2017 year total
> 765.  This is an increase of 51%.

319.   More than a year after the September 2016 meeting, further meeting
minutes reflect the continuing problems with prescriptions being written for
addictive drugs:  "[n]ew patients should never get narcotics on the first visit.  Make
sure to ask on previous medications what provider prescribed them the medications
we can request the records."

320.   Principally, the problem worsened because Dr. Smith (or someone on
his behalf) indiscriminately added his signature to stacks of prescriptions that had
been written by uncredentialed and unqualified staff for narcotics and other
addictive drugs.  From meeting minutes on March 23, 2017:

> Dr. Smith will not be coming in on Wednesday the 29th. Some patients can be moved preferably for a Monday, Wednesday, or Friday when we have more coverage. **[Person G] [Medical Assistant] will be handling scripts for that day.  Please note that scripts have already been written out, you will not be able to add on any more for patients.**

(emphasis added).

321.   NGHCC facilitated overprescribing through promotion of its in-house pharmacy to patients, stating in meeting minutes, "[p]lease remember to promote NGHCC pharmacy to every patient."

322.   Although the pharmacy had one certified pharmacist, most of the time the pharmacy was run by technicians who were not certified pharmacists or licensed with the U.S. Drug Enforcement Administration.

323.   The inadequately-staffed pharmacy problem was compounded by the fact that uncertified and unqualified staff at NGHCC were treating patients daily and called in prescriptions incorrectly all the time—asking for wrong drugs, dosages, and instructions.  Relator became aware of these problems because other pharmacies called NGHCC daily to complain about erroneously dangerous drugs being mis-prescribed and overprescribed by NGHCC staff.

324.   There were also numerous instances when drugs could not be accounted for.  From meeting minutes on March 30, 2017:

> Per [CEO] DeLaine [Hunter], new drug samples have to
> be checked in with [Person H].  All samples must also be
> checked out.  Both processes must be documented.
> **Yesterday, Advair was removed from [Person H]'s
> office and it was not documented for checkout**.

(emphasis added).

325.   NGHCC's records well-document that scores of its patients were suffering from opioid abuse or dependence.  Defendants created spreadsheets to track this information in the event of an audit by an insurer.

326.   Defendants identified over 1,100 patients in 2016 who were taking opioid or other addictive drugs.

327.   From 2015 - 2017, NGHCC's records show at least 45 patients whom NGHCC staff gave a primary diagnosis, 80 patients with a secondary diagnosis, and 63 patients with a third diagnosis, of opioid abuse or dependence.  NGHCC was treating at least 188 patients with documented opioid addictions.

328.   NGHCC also tracked which of its staff was treating patients taking opioids.

329.   As an example, Defendants were aware that uncredentialed NPP Person C was seeing over 260 patients who were taking opioids in December 2017.

330.   As alleged, NPP Person C was seeing, rendering and ordering services and prescribing drugs for these 260 patients with little to no meaningful oversight

92

or supervision by a physician.

331.   The medical records show that NGHCC (usually through LabCorp) was drug testing these patients and sometimes documenting when unexpected drugs were present, but there is no record NGHCC acted in any way upon that knowledge in its treatment plans.

**E.     Defendants Falsified and Forged Medical Records to Hide the Alleged Practices from the Regulators, and Knowingly Failed to Maintain Accurate Medical Records**

332.   The maintenance of accurate and complete medical records is critical to patient care.  If continuity of care for patients is to be assured, it is vital to keep good medical records, whether they are handwritten or electronic.  Good medical records ensure that the health care record for the patient is an accurate account of treatment, care planning and delivery.  The reverse is also true.  Poorly maintained medical records can negatively impact patient care.

333.   Because of the sheer volume of NGHCC patients taking dangerous drugs, the importance of creating and maintaining timely, accurate, and complete medical records was heightened.

334.   Yet, Defendants knowingly falsified patient medical records to avoid detection of the allegations in this Complaint when the regulators came on-site to conduct reviews.

335.   Relator witnessed Defendants orchestrate having non-medical staff change, alter, or add content to patients' medical records before regulators conducted biannual audits without appropriate physician supervision.

336.   As one very recent example, in April 2018, the Georgia Primary Care Association (GPCA) notified Defendants that it planned to audit NGHCC's compliance with the requirements of HHS's Title X Family Planning grant.

337.   According to HHS's description, the Title X Family Planning Program is "the only Federal program dedicated solely to the provision of family planning and related preventive health services.   The program is designed to provide contraceptive supplies and information to all who want and need them, with priority given to persons from low-income families. . . . Title X services include the delivery of related preventive health services, including patient education and counseling; cervical and breast cancer screening; sexually transmitted disease (STD) and human immunodeficiency virus (HIV) prevention education, testing, and referral; and pregnancy diagnosis and counseling."   HHS, "Program Requirements for Title X Funded Family Planning Projects," April 2014.

338.   The grant was provided to NGHCC to provide family planning services to its patients and funds may only be used for these services, as provided by the representations made in NGHCC's application.

339. Despite this requirement, NGHCC was knowingly misusing the grant funds it received under this program. NGHCC used family planning services grant funds for patients whose medical records showed they were not planning to have children, as shown by their age, medical conditions or their own words.

340. For example, NGHCC fraudulently certified that it provided family planning services to the following patients:

      a. Medicare Patient 16 —a 73-year-old female who had a hysterectomy and was being evaluated for vaginal cancer

      b. Medicare Patient 17 —a 69-year old male who stated that he "has no desire to have a child" and represented that he was abstinent

      c. Medicare Patient 18 —a 57-year-old female who had a hysterectomy and couldn't bathe herself

341. In each of these instances, plus at least dozens more, NGHCC falsely certified to the state and federal grant authorities that it was furnishing family planning services to patients for whom the medical records showed did not intend to start a family. NGHCC often made false representations as to the same patients on multiple occasions to draw funds.

342. When Georgia state authorities notified Defendants that they intended to audit NGHCC's compliance with this family planning services grant program,

Defendants fraudulently directed non-medical staff to add language to the medical records to suggest that family planning services were provided, even though they were not.

343.   In addition to this fraudulent activity, Defendants were well aware that the medical records for NGHCC patients were perpetually incomplete, inaccurate or not timely completed, and that this may be impacting patient care outcomes.

344.   Relator notified management as early as October 25, 2016, again in January 2017, and as recently as January 2018, of her serious concerns that patients' medical records were not being completed in a timely manner and were incomplete and inaccurate.

345.   In response to Relator's concern raised in April, NGHCC management responded by improperly directing unqualified staff, who had little to no medical training, to draft Medical Director Dr. Smith's medical notes and act as "scribes," even though these staff had no first-hand knowledge of the care or services rendered to the patients by Dr Smith or substitute staff.

346.   For example, licensed practical nurse, Person D, and Person I, who had no clinical training or medical experience, was directed to draft medical notes for insertion into patient medical records.

347.   Even after April 2018, problems with untimely, inadequate and

96

inaccurate medical records persisted. On May 4, Relator notified management again, in writing:

> Please refer to attachment for updated list on current chart deficiencies.  If you have any questions, please let the billing department know. . . . P.S. [Person I], I understand you will be doing Dr. Smith's scribing in the near future. These list[s] are the ones that are sent out after review of each days EHR records to show the charts that are not completed for billing.  You will also be provided with a paper copy for reference.  These chart deficiencies for Dr. Smith need to be completed ASAP in order for the billing department to file the charges.  We cannot close out that particular day's business until the charts are completed and insurance filed accordingly.

(emphasis added)

348.   NGHCC was so understaffed and poorly managed that management was expecting even medical students like Person J to complete medical record documentation for NPP Person C and Dr. Smith, despite the limitations imposed on medical students by the health care programs.

349.   Medical students cannot see patients or complete patient medical records.  Until they are in their residency, medical students are also not permitted to sign superbills.

350.   Despite these prohibitions, since at least 2017, NGHCC had medical students seeing patients and completing medical records without any physician involvement and signing superbills.

351.   In an email exchange with CEO Hunter, Relator informed Hunter that patients' medical records lacked physician notes, largely because no physician was seeing the patients or supervising medical staff who were seeing patients.

352.   CEO Hunter responded that "[Person J] [medical student] and [Person G] [medical assistant] should be doing the notes so they should be completed.  All [the provider] needs to do is "approve the notes". . . I don't understand what is happening when [Person J] (Mon-Thurs) and [Person G] Mon-Wed-Fri) are seeing his [Dr. Smith's] patients."

**F.**     **Defendants Knew that Compliance with the Relevant Laws Was Material to the Government's Decision to Pay Because They Went to the Essence of the Government's Bargain for Which it was Paying**

353.   Defendants' alleged knowing and fraudulent billing of medical services not rendered and laboratory services that were not reasonable and necessary, and Defendants' violations of the Anti-Kickback Statute, set forth in detail in this Complaint, go to the heart of government and private insurers benefit of the bargain to cover and pay for essential and life-saving health care services for its beneficiaries.

354.   The Anti-Kickback statute is designed to protect patients and federal health care programs from fraud and abuse.  Federal and state governments and private insurers expect decisions to be made by providers and laboratories regarding

optimal treatment and care for patients free of improper influence or inducement.

355.  Deciding upon the optimal course of treatment, including whether to take drugs, is a serious medical decision to be made between a physician and the patient.  Because patients rarely possess the comprehensive medical knowledge necessary to evaluate all their available options, including the necessity for drugs (especially opiates and other addictive drugs), they rely upon their physician's expertise to guide them through a decision-making process that identifies a personalized treatment plan by a credentialed provider.  A sense of trust and mutual respect between the patient and physician is critical to this process.

356.  It is therefore important to the government (and private insurers) to guard against attempts to influence the provider's treatment recommendations by those who might benefit financially, especially in the form of kickback arrangements to the provider or other health care partners, like laboratories and specialty providers, that participate in the federal health care programs.

357.  The government and other insurers prohibit kickback arrangements that provide financial incentives to health care providers and their partners in return for improper referrals, more laboratory tests (whether unnecessary or excessive), or writing prescriptions.

358.  Patients were exposed to the unlawful referrals and testing, as described

99

in *United States ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89 (3rd Cir. 2018).

359. NGHCC, CEO Hunter and Medical Director Smith had written policies in place that evidences their knowledge of these requirements and prohibitions, which Defendants were knowingly running afoul of.

360. As one example, NGHCC had written policies regarding how to treat and monitor patients suffering from chronic pain, including: (1) obtain evaluation by addiction counselor within 30 days of starting opioids or benzodiazepines, (2) place patients who receive daily opioid pain medications or benzodiazepines on pain management contracts that are evaluated and modified, as necessary, every three months, and (3) conduct regular urine toxicology screenings and pill audits to avoid patient addiction, abuse, or diversion. Thus, NGHCC was aware of the need for careful oversight and management of patients on narcotics, as required by the health care programs, but ignored their written policies, which memorialized the health care programs' requirements.

361. As another example, NGHCC had written policies recognizing the important that medical records be complete, accurate and timely: "[p]rovider notes will be placed within the EHR within 24 hours of the patient encounter."

362. NGHCC further knew that "[i]t is the responsibility of North Georgia

100

Healthcare Center (NGHCCC) to ensure the safe and secure management of FP10 prescription forms for services provided at all times, governed by a robust clinical team, with framework in place to support the prescriber, the Health Care Professionals in charge and safeguard the community."

363.   The allegations show that Defendants were well-aware of the statutory and regulatory requirements and prohibitions set forth in this Complaint and that Defendants knew (or should have known) that these violations were material to the Government's decision to pay.

364.   Defendants' violations were serious and material, leading to actual or potential patient harm, and not merely technical or minor infractions of rules. Defendants' violations were made with actual knowledge of the seriousness of their violations, and not simply a case of a defendant acting with reckless disregard.

365.   In short, there is ample evidence to show that Defendants, including LabCorp, knew or should have known that their violations had the natural tendency to influence the government's decision to pay the Medicare, Medicaid, TRICARE, and other federal health care program claims (and state claims and private insurance claims in the states of California and Illinois) and that any reasonable person would attach importance to Defendants' choice of actions.

## V.   DEFENDANTS UNLAWFULLY RETALIATED AGAINST RELATOR

366.   As set forth in this Complaint, Relator informed management of her concerns related directly to the allegations set forth in the Complaint.  She was troubled that Defendants were engaged in unlawful practices that could harm patients.  She also feared for her job security and the legal propriety of Defendants' actions.

367.   Yet, Relator was reprimanded and retaliated against by Defendants when she objected to Defendants' fraudulent practices.

368.   Within the first few months of working at NGHCC, Relator began to raise certain concerns alleged in this Complaint with CEO Hunter, the CFO, the Head of Human Resources, and Deputy CEO.

369.   For example, Relator attended a training conference where the importance to the federal and state health care programs of ensuring that providers were properly credentialed and the consequences for the failure to do so were discussed.  She immediately recognized that NGHCC was not properly ensuring its providers were credentialed, in violation of health care program requirements.

370.   In response to Relator raising this issue, the CFO and Deputy CEO Person K quieted Relator:  "[CEO Hunter] will not hear you" and you will just "put a target on your back" by raising these concerns.

371. Relator set aside these warnings and scheduled a meeting with CEO Hunter, the Deputy CEO, and the CFO, believing in earnest that she could help make a change for the better.

372. In the meeting, CEO Hunter belittled Relator's suggestions, minimized the issues she was raising, told her "not to worry," remarked that all the responsibilities fell upon the CEO to address (and not Relator) and that she (CEO Hunter) appropriately operates "in the gray area," and stated that the Georgia state office "has all this under control." The CFO and Deputy CEO remained silent during the meeting.

373. Early during Relator's tenure, a Georgia state official with the Georgia Primary Care Association (GPCA) that provides oversight of FQHCs, when conducting an in-house audit of NGHCC, spoke with Relator about NGHCC's billing practices. The official raised at least four issues that she found troubling: (a) that NGHCC was only billing under a single provider number for Medical Director Smith, (b) that providers were not properly credentialed, (c) that Dr. Smith was the only supervising physician at the facility, and (d) that, as the only supervising physician, Dr. Smith was present at the facility no more than once per week, at most. The state official cautioned Relator and the CFO that these were serious violations of Medicare and other insurers' requirements. These concerns were taken to CEO

103

Hunter, but the problems persisted unabated.

374.   During her tenure, Relator continued to raise the same concerns as were raised by the Georgia state official with Defendants and NGHCC's CFO and Deputy CEO.  The CFO assured Relator that these issues were under control whenever Relator followed up to inquire whether changes would be made.

375.   Relator continued to try to speak with CEO Hunter to address these issues.  However, the CEO avoided meetings with Relator altogether or scheduled meetings so that time was only permitted to focus on subjects the CEO approved in advance of the meeting.  In advance of meetings that Relator participated in with the senior managers, the CFO always insisted that Relator give her a list of questions and topics Relator wanted to raise in advance.  Yet, the topics were never addressed during the meetings.  The CFO confided in Relator that CEO Hunter directed the CFO to avoid further discussions of the recurring issues raised by Relator.

376.   On a later occasion, CEO Hunter discovered that NGHCC was losing money by not scheduling patients for annual wellness visits that were 100 percent covered by the government-insured health care programs.  Relator relayed her understanding that uncredentialed nurses (LPNs and RNs) could not provide these services and bill the health care programs for them.  CEO Hunter asked Relator to confirm that understanding with the Medicare program, which Relator did.  Relator

104

took the further opportunity to confirm with the Medicare program official that her other concerns were valid, which he confirmed over the phone and in an email. Relator informed CEO Hunter, the Deputy CEO, the CFO, the state official and other state employees of Medicare's position, by forwarding the email communication from the Medicare program officer. Yet, Defendants and the other managers at NGHCC ignored Relator's concerns and this additional information provided by a Government official.

377. Relator was continually ignored, marginalized and made to feel belittled. Relator's office was moved to a storage room. Staff positions in the billing group were cut and Relator learned second hand that management was considering outsourcing her billing duties, as well.

378. Relator feared for her job security and the legal propriety of Defendants' action.

379. On or about May 9, 2018, Relator resigned from her position at NGHCC. Defendants had constructively discharged Relator, having caused her to resign from her job, as alleged in this Complaint.

380. Defendants retaliated against Relator because of lawful acts by Relator to stop one or more violations of the False Claim Act and lawful acts by Relator in furtherance of an action under 31 U.S.C. § 3730.

381. For the reasons set forth in this Complaint, Relator is entitled to reinstatement, double the amount of back pay, interest on the back pay and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, and all other remedies and recompense allowable under 31 U.S.C. § 3730(h).

## COUNT I

### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(A)

382. The allegations in the preceding paragraphs are incorporated by reference.

383. Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

384. In addition, by virtue of the kickbacks (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)), misrepresentations and submissions of non-reimbursable claims on a corporate-wide basis described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for the improper payment of medical and laboratory services on behalf of federal health care program beneficiaries.

385.   The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.  Defendants' representations were material to the government's decision to pay the medical and laboratory claims.

386.   Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

387.   As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT II

### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(B)

388.   The allegations in the preceding paragraphs are incorporated by reference.

389.   Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729 (a)(1)(B).

390.   In addition, by virtue of the kickbacks (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)), misrepresentations and submissions of non-reimbursable claims on a corporate-wide basis described above, Defendants

107

knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim for the improper payment or approval of medical and laboratory services on behalf of federal health care program beneficiaries.

391.   The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.  Defendants' representations were material to the government's decision to pay the medical and laboratory claims.

392.   Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

393.   As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

### COUNT III

**Federal False Claims Act:**
**31 U.S.C. § 3729(a)(1)(C)**
**Conspiracy**

394.   The allegations in the preceding paragraphs are incorporated by reference.

395. Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729 (a)(1)(C).

396. In addition, by virtue of kickbacks (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)), misrepresentations and submissions of non-reimbursable claims on a corporate-wide basis described above, Defendants knowingly conspired to commit violations of the False Claims Act for the improper payment or approval of medical and laboratory services on behalf of federal health care program beneficiaries.

397. The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed. Defendants' representations were material to the government's decision to pay the medical and laboratory claims.

398. Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

399. As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT IV

### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(G)

400.   The allegations in the preceding paragraphs are incorporated by reference.

401.   Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729 (a)(1)(G).

402.   In addition, by virtue of kickbacks (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)), misrepresentations and submissions of non-reimbursable claims on a corporate-wide basis described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

403.   The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.  Defendants' representations were material to the government's decision to pay the medical and laboratory claims.

110

404. Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

405. As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT V

### Federal False Claims Based on Anti-Kickback Statute
### 31 U.S.C. § 3729(a)(1)(A); 42 U.S.C. § 1320a-7b(b)

406. The allegations in the preceding paragraphs are incorporated by reference.

407. Defendants knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729 (a)(1)(A).

408. By virtue of the kickbacks (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)), misrepresentations and submissions of non-reimbursable claims on a corporate-wide basis described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for the improper payment or approval of medical and laboratory services on behalf of federal health care program beneficiaries.

111

409.   The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.  Defendants' representations were material to the government's decision to pay the medical and laboratory claims.

410.   Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

411.   As a result of Defendants' violations, the United States has suffered substantial damages in an amount to be determined at trial.

## COUNT VI

### Arkansas State Medicaid Fraud False Claims Act, Ark. Code § 20-77-900, et seq.

412.   The allegations in the preceding paragraphs are incorporated by reference.

413.   Relator also brings this action on behalf of the State of Arkansas, against Defendants under the Arkansas State Medicaid Fraud False Claims Act ("FCA"), Ark. Code § 20-77-900 et seq.

414.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Arkansas FCA, Ark. Code § 20-77-902, which create liability for any person who:

112

(**1**) Knowingly makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under the Arkansas Medicaid program;

(**2**) At any time knowingly makes or causes to be made any false statement or representation of a material fact for use in determining rights to a benefit or payment;

\*\*\*

(**6**) Knowingly solicits or receives any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind:

(**A**) In return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under the program; or

(**B**) In return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under the program;

(**7**) (**A**) Knowingly offers or pays any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce the person:

(**i**) To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under the program; or

(**ii**) To purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under the program.

415.   Pursuant to the Arkansas FCA, based on Defendants' material non-

disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Ark. Code § 20-77-900 et seq.

416.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT VII

### California False Claims Act,
### Cal. Gov't Code § 12650, et seq.

417.   The allegations in the preceding paragraphs are incorporated by reference.

418.   Relator also brings this action on behalf of the State of California, against Defendants under the California False Claims Act ("FCA"), Cal. Gov't Code § 12652(c).

419.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(1), which creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

420.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

421.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the California FCA, Cal. Gov't Code § 12651(a)(7), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision."

422.   Pursuant to the California FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Cal. Gov't Code § 12651(a)(1).

423.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

115

## COUNT VIII

### Colorado Medicaid False Claims Act,
### Colo. Rev. Stat. §§ 25.5-4-303.5, et seq.

424. The allegations in the preceding paragraphs are incorporated by reference.

425. Relator also brings this action in the name of the State of Colorado, against Defendants pursuant to the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306.

426. Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the Colorado FCA, Colo. Rev. Stat. § 25.5-4-305(1)(a), which creates liability for any person who "[k]nowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval."

427. Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the Colorado FCA, Colo. Rev. Stat. § 25.5-4-305(1)(b), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

428. Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the

116

Colorado FCA, Colo. Rev. Stat. § 25.5-4-305)1)(f), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act,' or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act.'"

429. Pursuant to the Colorado FCA, based on Defendants' material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Colo. Rev. Stat. § 25.5-4-305(1).

## COUNT IX
### Connecticut False Claims Act,
### Conn. Gen. Stat. §§ 4-274, et seq.

430. The allegations in the preceding paragraphs are incorporated by reference.

431. Relator also brings this action in the name of the State of Connecticut, against Defendants pursuant to the Connecticut False Claims Act, Conn. Gen. Stat. § 4-277.

117

432. Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(1), which provides that no person shall "[k]nowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a state-administered health or human services program."

433. Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(2), which provides that no person shall "[k]nowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program."

434. Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provisions of the Connecticut FCA, Conn. Gen. Stat. § 4/275(a)(7), which provides that no person shall "[k]nowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state under a state-administered health or human services program."

435.   Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(8), which provides that no person shall "[k]nowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the state under a state-administered health or human services program."

436.   Pursuant to the Connecticut FCA, based on Defendants' material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by the law.  Conn. Gen. Stat. § 4-275(b).

## COUNT X

### Delaware False Claims & Reporting Act,
### Del. Code Ann. Tit. 6 § 1201, et seq.

437.   The allegations in the preceding paragraphs are incorporated by reference.

438.   Relator also brings this action on behalf of the Government of the State of Delaware, against Defendants under the State of Delaware's False Claims and Reporting Act ("FCA"), Del. Code Ann. tit. 6, § 1203(b)(1).

439.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Delaware FCA,

Del. Code Ann. tit. 6, §1201(a)(1), which creates liability for any person who "[k]nowingly presents, or causes to be presented a false or fraudulent claim for payment or approval."

440.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Delaware FCA, Del. Code Ann. tit. 6, §1201(a)(2), which creates liability for any person who "[k]nowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim."

441.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Delaware FCA, Del. Code Ann. tit. 6, §1201(a)(7), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

442.   Pursuant to the Delaware FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Del. Code Ann. tit. 6, §1201(a).

120

443.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XI

### District of Columbia False Claims Act,
### D.C. Code Ann. §§ 2.381.01, et seq.

444.   The allegations in the preceding paragraphs are incorporated by reference.

445.   Relator also brings this action in the name of the District of Columbia, against Defendants under the District of Columbia False Claims Act, D.C. Code Ann. § 2-381.03(b)(1).

446.   Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(1), which creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

447.   Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

121

448. Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the D.C. FCA, D.C. Code Ann. § 2-381.02(a)(6), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District."

449. Pursuant to the D.C. FCA, based on Defendants' material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Defendants are thus liable to the District for statutorily defined damages sustained because of the acts of Defendants and civil penalties. D.C. Code Ann. § 2-381.02(a).

## COUNT XII

### Florida False Claims Act,
### Fla. Stat. § 68.081, et seq.

450. The allegations in the preceding paragraphs are incorporated by reference.

451.   Relator also brings this action on behalf of the State of Florida, against Defendants under the State of Florida's False Claims Act ("FCA"), Fla. Stat. § 68.083(2).

452.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(a), which creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval."

453.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(b), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

454.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Florida FCA, Fla. Stat. § 68.082(2)(g), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals

or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

455.   Pursuant to the Florida FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Fla. Stat. § 68.082(2).

456.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XIII

### Georgia False Medicaid Claims Act,
### O.C.G.A. § 49-4-168, et seq.

457.   The allegations in the preceding paragraphs are incorporated by reference.

458.   Relator also brings this action in the name of the State of Georgia, against Defendants pursuant to the State of Georgia False Medicaid Claims Act ("FMCA"), O.C.G.A. § 49-4-168 et seq.

459.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Georgia FMCA, O.C.G.A. § 49-4-168.1(a)(1), which creates liability for any person who

124

"[k]nowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval."

460.   Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Georgia FMCA, O.C.G.A. § 49-4-168.1(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

461.   Defendants, through their material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Georgia FMCA, O.C.G.A. § 49-4-168.1(a)(7), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program."

462.   Pursuant to the Georgia FMCA, based on Defendants' material misrepresentations, non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law.  O.C.G.A. § 49-4-168.1(a).

463.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XIV

### Hawaii False Claims Act,
### Haw. Rev. Stat. §§ 661-21, et seq.

464.    The allegations in the preceding paragraphs are incorporated by reference.

465.    Relator also brings this action on behalf of the State of Hawaii and its political subdivisions, against Defendants under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-25(a).

466.    Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(l), which creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

467.    Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(2), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

126

468.   Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated the provision of the Hawaii FCA, Haw. Rev. Stat. § 661-21(a)(6), which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

469.   Pursuant to the Hawaii FCA, based on Defendants' material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Haw. Rev. Stat. § 661-21(a).

## COUNT XV

### Illinois False Claims Act,
### 740 Ill. Comp. Stat. 175/1, et seq.

470.   The allegations in the preceding paragraphs are incorporated by reference.

471.   Relator also brings this action on behalf of the State of Illinois, against Defendants under the Illinois False Claims Act ("FCA"), 740 Ill. Comp. Stat. 175/4(b).

472.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(A), which creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

473.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(B), which creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

474.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Illinois FCA, 740 Ill. Comp. Stat. 175/3(a)(1)(G), which creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

475.   Pursuant to the Illinois FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are

liable to the State for treble damages, civil penalties, and all other relief authorized by law. 740 Ill. Comp. Stat. 175/3(a).

476. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XVI

### Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.7, et seq.

477. The allegations in the preceding paragraphs are incorporated by reference.

478. Relator also brings this action on behalf of the State of Indiana, against Defendants under the State of Indiana False Claims and Whistleblower Protection Act ("FCA"), Ind. Code § 5-11-5.7-4(a).

479. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(l), creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

480. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(2), creates liability for any person who "knowingly makes,

uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim."

481.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Indiana FCA, Ind. Code § 5-11-5.7-2(a)(6)(A)-(B), which creates liability for any person who "(A) makes, uses, or causes to be made or used, a false record or statement concerning an obligation to pay or transmit money or property to the state; or (B) conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

482.   Pursuant to the Indiana FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Ind. Code § 5-11-5.5-2(b).

483.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XVII

### Iowa False Claims Act,
### Iowa Code § 685.1, et seq.

484.   The allegations in the preceding paragraphs are incorporated by reference.

485.   Relator also brings this action on behalf of the State of Iowa, against Defendants under the State of Iowa False Claims Act ("FCA"), Iowa Code § 685.3(2)a.

486.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Iowa FCA, Iowa Code § 685.2(1).a, which creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

487.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Iowa FCA, Iowa Code § 685.2(1).b, which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

488.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Iowa FCA, Iowa Code § 685.2(1).g, which creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals

or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state."

489.   Pursuant to the Iowa FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Iowa Code § 685.2(1).

490.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XVIII

### Louisiana Medical Assistance Programs Integrity L aw, La. Rev. Stat. Ann. § 46:437.1, et seq.

491.   The allegations in the preceding paragraphs are incorporated by reference.

492.   Relator also brings this action on behalf of the State of Louisiana's medical assistance programs, against Defendants under the State of Louisiana Medical Assistance Programs Integrity Law ("FCA"), La. Rev. Stat. Ann. § 46:439.1.A.

493.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Louisiana FCA,

132

La. Rev. Stat. Ann. § 46:438.3.A, which states that "[n]o person shall knowingly present or cause to be presented a false or fraudulent claim."

494.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.B, which states that "[n]o person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim."

495.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.C, which states that "[n]o person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs."

496.   Pursuant to the Louisiana FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. La. Rev. Stat. Ann. § 46:438.6.

497.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XIX

### Maryland False Health Claims Act,
### Md. Code Ann. Health-Gen. § 2-601, et seq.

498.   The allegations in the preceding paragraphs are incorporated by reference.

499.   Relator also brings this action on behalf of the State of Maryland, against Defendants under the State of Maryland False Health Claims Act ("FCA"), Md. Code Ann. Health-Gen. § 2-604(a)(1).

500.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(1), which states that a person may not "[k]nowingly present or cause to be presented a false or fraudulent claim for payment or approval."

501.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(2), which states that a person may not "[k]nowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim."

134

502.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(7), which states that a person may not "[k]nowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State."

503.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(8), which states that a person may not "[k]nowingly conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to the State."

504.    Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(9), which states that a person may not "[k]nowingly make any other false or fraudulent claim against a State health plan or a State health program."

505.    Pursuant to the Maryland FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Md. Code Ann. Health-Gen. § 2-602(b).

506.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XX

### The Commonwealth of Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12, § 5A, et seq.

507.   The allegations in the preceding paragraphs are incorporated by reference.

508.   Relator also brings this action on behalf of the Commonwealth of Massachusetts, against Defendants under the Massachusetts False Claims Act ("FCA"), Mass. Ann. Laws ch. 12, § 5C(2).

509.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(1), which creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

510.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(2), creates liability for any person who "knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim."

511.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Massachusetts FCA, Mass. Ann. Laws ch. 12, § 5B(9), which creates liability for any person who "knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof."

512.   Pursuant to the Massachusetts FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mass. Ann. Laws ch. 12, § 5B(a).

513.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXI

### Michigan Medicaid False Claims Act,
### Mich. Comp. Laws Serv. § 400.601, et seq.

514.   The allegations in the preceding paragraphs are incorporated by reference.

137

515.   Relator also brings this action in the name of the State of Michigan,

against Defendants under the State of Michigan Medicaid False Claims Act

("FCA"), Mich. Comp. Laws Serv. § 400.610a(l).

516.   Defendants, through their material non-disclosures and other wrongful

acts and omissions set forth above, violated each of the following provisions of the

Michigan FCA, Mich. Comp. Laws Serv. § 400.603(1)-(3):

> "(1)   A person shall not knowingly make or cause to be made a
> false statement or false representation of a material fact in an
> application for Medicaid benefits.
>
> (2)       A person shall not knowingly make or cause to be
> made a false statement or false representation of a material fact
> for use in determining rights to a Medicaid benefit.
>
> (3)       A person, who having knowledge of the occurrence of an
> event affecting his initial or continued right to receive a
> Medicaid benefit or the initial or continued right of any other
> person on whose behalf he has applied for or is receiving a
> benefit, shall not conceal or fail to disclose that event with
> intent to obtain a benefit to which the person or any other
> person is not entitled or in an amount greater than that to which
> the person or any other person is entitled."

517.   Defendants, through their material non-disclosures and other wrongful

acts and omissions set forth above, violated the provision of the Michigan FCA,

Mich. Comp. Laws Serv. § 400.607(1), which states that "[a] person shall not make

or present or cause to be made or presented to an employee or officer of this state a

claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false."

518.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated the provision of the Michigan FCA, Mich. Comp. Laws Serv. § 400.607(3), which states that "[a] person shall not knowingly make, use, or cause to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state pertaining to a claim presented under the social welfare act."

519.   Pursuant to the Michigan FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Mich. Comp. Laws. Serv. § 400.612.

520.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXII

### Minnesota False Claims Act,
### Minn. Stat. §§ 15C.01, et seq.

521.   The allegations in the preceding paragraphs are incorporated by reference.

522.    Relator also brings this action on behalf of the State of Minnesota and its political subdivisions, against Defendants under the State of Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

523.    Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated each of the following provisions of the Minnesota FCA, Minn. Stat. § 15C.02(a), which create liability for any person who:

"(1)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)    knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

…

(7)    knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a political subdivision, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a political subdivision."

524.    Pursuant to the Minnesota FCA, based on Defendants' material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth

140

above, Defendants are liable to the State for treble damages, civil penalties, and all

other relief authorized by law. Minn. Stat. § 15C.02(a).

## COUNT XXIII

### Missouri Health Care Payment Fraud and Abuse Statute, MO Rev. Code § 191.900, et seq.

525.   The allegations in the preceding paragraphs are incorporated by

reference.

526.   Relator also brings this action on behalf of the State of Missouri,

against Defendants under the Missouri Health Care Payment Fraud and Abuse

Statute ("FCA"), MO Rev. Code § 191.900, et seq.

527.   Defendants, through their material non-disclosures and other wrongful

acts and omissions set forth above, violated each of the following provisions of the

Missouri FCA, MO Rev. Code § 191.905, which create liability for any person

who:

> 91.905. 1. No health care provider shall knowingly make or
> cause to be made a false statement or false representation of a
> material fact in order to receive a health care payment,
> including but not limited to:
>
> (1) Knowingly presenting to a health care payer a claim for a
> health care payment that falsely represents that the health care
> for which the health care payment is claimed was medically
> necessary, if in fact it was not;

141

(2) Knowingly concealing the occurrence of any event affecting an initial or continued right under a medical assistance program to have a health care payment made by a health care payer for providing health care;

(3) Knowingly concealing or failing to disclose any information with the intent to obtain a health care payment to which the health care provider or any other health care provider is not entitled, or to obtain a health care payment in an amount greater than that which the health care provider or any other health care provider is entitled;

\*\*\*

2. No person shall knowingly solicit or receive any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for:

(1) Referring another person to a health care provider for the furnishing or arranging for the furnishing of any health care; or

(2) Purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any health care.

3. No person shall knowingly offer or pay any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer another person to a health care provider for the furnishing or arranging for the furnishing of any health care.

528.    Pursuant to the Missouri FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. MO Rev. Code § 191.905.

142

529.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXIV

### Montana False Claims Act,
### Mont. Code Ann. § 17-8-401, et seq.

530.   The allegations in the preceding paragraphs are incorporated by reference.

531.   Relator also brings this action on behalf of the State of Montana, against Defendants under the State of Montana False Claims Act ("FCA"), Mont. Code Ann. § 17-8-406(1).

532.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Montana FCA, Mont. Code Ann. § 17-8-403(1), which create liability for any person who:

> "(a)   knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;
>
> (b)    knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; [or]
>
> ...

> (g)   knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to a governmental entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to a governmental entity."

533.   Pursuant to the Montana FCA, based on Defendants' material non-disclosures

and other wrongful acts and omissions set forth above, Defendants are liable

to the State for treble damages, civil penalties, and all other relief authorized by law.

Mont. Code Ann. § 17-8-403(2).

534.   As a result of Defendants' violations, the state has suffered damages in

an amount to be determined at trial.

## COUNT XXV

### Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. § 357.010, et seq.

535.   The allegations in the preceding paragraphs are incorporated by

reference.

536.   Relator also brings this action on behalf of the State of Nevada,

against Defendants under the State of Nevada Submission of False Claims to State

or Local Government Act ("FCA"), Nev. Rev. Stat. § 357.080(1).

144

537.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Nevada FCA, Nev. Rev. Stat. § 357.040(l), which create liability for any person who:

> "(a)   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.
>
> (b)   Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim.
>
> …
>
> (f)   Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the State or a political subdivision; or
>
> (g)   Knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State or a political subdivision.

538.   Pursuant to the Nevada FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Nev. Rev. Stat. § 357.040(2).

539.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXVI

### New Hampshire False Claims Act,
### N.H. Rev. Stat. Ann. § 167:61-B, et seq.

540.   The allegations in the preceding paragraphs are incorporated by reference.

541.   Relator also brings this action on behalf of the State of New Hampshire, against Defendants under the State of New Hampshire False Claims Act ("FCA"), N.H. Rev. Stat. Ann. § 167:61-b, et seq.

542.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of The New Hampshire FCA, N.H. Rev. Stat. Ann. § 167:61-b, which create liability for any person who:

> "(a)   Knowingly presents, or causes to be presented, to an officer or employee of the department, a false or fraudulent claim for payment or approval.
>
> (b)   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the department.
> …

(d)     Has possession, custody, or control of property or money used, or to be used, by the department and, intending to defraud the department or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt.

(e)     Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the department; or

(f)     Is a beneficiary of an inadvertent submission of a false claim to the department, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the department within a reasonable time after discovery of the false claim."

543.   Pursuant to the New Hampshire FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.H. Rev. Stat. Ann. § 167:61-b, et seq.

544.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXVII

### New Jersey False Claims Act,
### N.J. Stat. Ann. § 2A:32C-1, et seq.

545.   The allegations in the preceding paragraphs are incorporated by reference.

546. Relator also brings this action in the name of the State of New Jersey,

against Defendants pursuant to the State of New Jersey False Claims Act ("FCA"),

N.J. Stat. Ann. § 2A:32C-5.b.

547. Defendants, through their material non-disclosures and other wrongful

acts and omissions set forth above, violated each of the following provisions of

The New Jersey FCA, N.J. Stat. Ann. § 2A:32C-3, which create liability for any

person who:

> "a.     Knowingly presents or causes to be presented to an
> employee, officer or agent of the State, or to any contractor,
> grantee, or other recipient of State funds, a false or fraudulent
> claim for payment or approval;
>
> b.     Knowingly makes, uses, or causes to be made or used a
> false record or statement to get a false or fraudulent claim paid
> or approved by the State;
> …
> g.     Knowingly makes, uses, or causes to be made or used a
> false record or statement to conceal, avoid, or decrease an
> obligation to pay or transmit money or property to the State."

548. Pursuant to the New Jersey FCA, based on Defendants' material non-

disclosures and other wrongful acts and omissions set forth above, Defendants are

liable to the State for treble damages, civil penalties, and all other relief authorized

by law. N.J. Stat. Ann. § 2A:32C-3.

549. As a result of Defendants' violations, the state has suffered damages

in an amount to be determined at trial.

## COUNT XXVIII

## New Mexico Medicaid False Claims Act,
## N.M. Stat. Ann. § 27-14-1, et seq.

550.   The allegations in the preceding paragraphs are incorporated by reference.

551.   Relator also brings this action on behalf of the State of New Mexico, against Defendants under the State of New Mexico Medicaid False Claims Act ("FCA"), N.M. Stat. Ann. § 27-14-7.B.

552.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the New Mexico FCA, N.M. Stat. Ann. § 27-14-4, which create liability for any person who:

> "A.    presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent;
>
> B.    presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program;
>
> C.    makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false; [or]
>
> …

E.    makes, uses or causes to be made or used a record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state, relative to the Medicaid program, knowing that such record or statement is false."

553.    Pursuant to the New Mexico FCA, Defendants are thus liable to the State for statutorily defined damages sustained because of the acts of Defendants and such other relief as authorized. N.M. Stat. Ann. § 27-14-4.

554.    As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXIX

### New York False Claims Act,
### N.Y. State Fin. Law §§ 187, et seq.

555.    The allegations in the preceding paragraphs are incorporated by reference.

556.    Relator also brings this action on behalf of the State of New York, against Defendants under the State of New York False Claims Act, N.Y. State Fin. Law § 190(2).

557.    Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated each of the following provisions of the New York FCA, N.Y. State Fin. Law § 189(1), which create liability for any person who:

"(a) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

…

(g)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; or

(h)     knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same…."

558.   Pursuant to the New York FCA, based on Defendants' material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. N.Y. State Fin. Law § 189(1).

## COUNT XXX

### North Carolina False Claims Act,
### N.C. Gen. Stat. § 1-605, et seq.

559.   The allegations in the preceding paragraphs are incorporated by reference.

560.   Relator also brings this action on behalf of the State of North

Carolina, against Defendants under the State of North Carolina False Claims Act

("FCA"), N.C. Gen. Stat. § 1-608(b).

561.   Defendants, through their material non-disclosures and other wrongful

acts and omissions set forth above, violated each of the following provisions of the

North Carolina FCA, N.C. Gen. Stat. § 1-607(a), which create liability for any

person who:

> "(1)   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.
>
> (2)   Knowingly makes, uses, causes to be made or used, a false record or statement material to a false or fraudulent claim. …
>
> (7)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State."

562.   Pursuant to the North Carolina FCA, based on Defendants' material

non-disclosures and other wrongful acts and omissions set forth above, Defendants

are liable to the State for treble damages, civil penalties, and all other relief

authorized by law. N.C. Gen. Stat. § 1-607(a).

563.   As a result of Defendants' violations, the state has suffered damages

in an amount to be determined at trial.

## COUNT XXXI

### Oklahoma Medicaid False Claims Act,
### Okla. Stat. Tit. § 63-5053, et seq.

564.   The allegations in the preceding paragraphs are incorporated by reference.

565.   Relator also brings this action in the name of the State of Oklahoma, against Defendants pursuant to the State of Oklahoma Medicaid False Claims Act ("FCA"), Okla. Stat. tit. § 63-5053.2(B).

566.   Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Oklahoma FCA, Okla. Stat. tit. § 63-053.1(B), which create liability for any person who:

> "1.    Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;
>
> 2.    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;
> … or
>
> 7.    Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state."

567.   Pursuant to the Oklahoma FCA, based on Defendants' material non-

153

disclosures and other wrongful acts and omissions set forth a in an amount to be

determined at trial.

## COUNT XXXII

### Rhode Island False Claims Act,
### R.I. Gen. Laws § 9-1.1-1, et seq.

568.   The allegations in the preceding paragraphs are incorporated by

reference.

569.   Relator also brings this action in the name of the State of Rhode

Island, against Defendants pursuant to the State of Rhode Island False Claims Act

("FCA"), R.I. Gen. Laws § 9-1.1-4(b).

570.   Defendants, through their material non-disclosures and other wrongful

acts and omissions set forth above, violated each of the following provisions of the

Rhode Island FCA, R.I. Gen. Laws § 9-1.1-3(a), which create liability for any

person who:

> "(1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;
>
> (2)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
> …
> (7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals

154

> or knowingly and improperly avoids or decreases an obligation
> to pay or transmit money or property to the state…."

571.   Pursuant to the Rhode Island FCA, based on Defendants' material

non-disclosures and other wrongful acts and omissions set forth above, Defendants

are liable to the State for treble damages, civil penalties, and all other relief

authorized by law. R.I. Gen. Laws § 9-1.1-3(a).

572.   As a result of Defendants' violations, the state has suffered damages

in an amount to be determined at trial.

### COUNT XXXIII

**Tennessee Medicaid False Claims Act,**
**Tenn. Code Ann. § 71-5-181, et seq.**

573.   The allegations in the preceding paragraphs are incorporated by

reference.

574.   Relator also brings this action in the name of the State of Tennessee,

against Defendants under the Tennessee Medicaid False Claims Act ("FCA"),

Tenn. Code Ann. § 71-5-183(b)(1).

575.   Defendants, through their material non-disclosures and other wrongful

acts and omissions set forth above, violated each of the following provisions of the

Tennessee FCA, Tenn. Code Ann. § 71-5-182(a)(l), which create liability for any

person who:

155

"(A) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the Medicaid program;

(B)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the Medicaid program; [or]

(C)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the Medicaid program."

576.   Pursuant to the Tennessee FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Tenn. Code Ann. § 71-5-182(a).

577.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXIV

### Texas Medicaid Fraud Prevention Act,
### Tex. Hum. Res. Code § 36.001, et seq.

578.   The allegations in the preceding paragraphs are incorporated by reference.

579.   Relator also brings this action in the name of the State of Texas,

against Defendants under the State of Texas Medicaid Fraud Prevention Act

("FCA"), Tex. Hum. Res. Code § 36.101(a).

580.   Defendants, through their material non-disclosures and other wrongful

acts and omissions set forth above, violated each of the following provisions of the

Texas FCA, Tex. Hum. Res. Code § 36.002, which create liability for any person

who, *inter alia*:

> "(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

> (2)   knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

> (3)   knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;
> …

> (12)   knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or

157

property to this state under the Medicaid program; or

(13) knowingly engages in conduct that constitutes a violation under Section 32.039(b)."

581. Pursuant to the Texas FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Tex. Hum. Res. Code § 36.052.

582. As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXV

### Vermont False Claims Act,
### Vt. Stat. Tit. 32, 630, et seq.

583. The allegations in the preceding paragraphs are incorporated by reference.

584. Relator also brings this action in the name of the State of Vermont, against Defendants under the State of Vermont False Claims Act ("FCA"), Vt. Stat. Ann. tit. 32, § 632(b).

585. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Vermont FCA, Vt. Stat. Ann. tit. 32, § 631, which state that no person shall:

158

"(1) knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;

(2)   knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;

…

(8)   enter into a written agreement or contract with an official of the State or its agent knowing the information contained therein is false;

(9)   knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State; [or]

(10)  knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State;

586.   Pursuant to the Vermont FCA, based on Defendants' material non-

disclosures and other wrongful acts and omissions set forth above,

Defendants are liable to the State for treble damages, civil penalties, and all other

relief authorized by law. Vt. Stat. Ann. tit. 32, § 631(b).

587.   As a result of Defendants' violations, the state has suffered damages

in an amount to be determined at trial.

## COUNT XXVI

### The Commonwealth of Virginia
### Fraud Against Taxpayers Act,
### Va. Code Ann. § 8.01-216.1, et seq.

588. The allegations in the preceding paragraphs are incorporated by reference.

589. Relator also brings this action on behalf of the Commonwealth of Virginia, against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act ("FCA"), Va. Code Ann. § 8.01-216.5(A).

590. Defendants, through their material non-disclosures and other wrongful acts and omissions set forth above, violated each of the following provisions of the Virginia FCA, Va. Code Ann. § 8.01-216.3(A), which create liability for any person who:

> "1. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> 2. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> …
> 7. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth."

591. Pursuant to the Virginia FCA, based on Defendants' material non-

disclosures and other wrongful acts and omissions set forth above,

Defendants are liable to the State for treble damages, civil penalties, and all other

relief authorized by law. Va. Code Ann. § 8.01-216.3(A).

592.   As a result of Defendants' violations, the state has suffered damages

in an amount to be determined at trial.  (this needs to be a new para with a new no.)

## COUNT XXXVII

### Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005, et seq.

593.   The allegations in the preceding paragraphs are incorporated by

reference.

594.   Relator also brings this action on behalf of the State of Washington,

against Defendants under the Washington State Medicaid Fraud False Claims Act

("FCA"), Wash. Rev. Code § 74.66.050(1).

595.   Defendants, through their material non-disclosures and other wrongful

acts and omissions set forth above, violated each of the following provisions of the

Washington FCA, Wash. Rev. Code § 74.66.020(1), which create liability for any

person who:

> "(a) Knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval;
>
> (b)     Knowingly makes, uses, or causes to be made or used, a
> false record or statement material to a false or fraudulent claim;

161

[or]

…

(g)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government entity, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the government entity."

596.   Pursuant to the Washington FCA, based on Defendants' material non-disclosures and other wrongful acts and omissions set forth above, Defendants are liable to the State for treble damages, civil penalties, and all other relief authorized by law. Wash. Rev. Code § 74.66.020(1).

597.   As a result of Defendants' violations, the state has suffered damages in an amount to be determined at trial.

## COUNT XXXVIII

### Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §§ 20.931, et seq.

598.   The allegations in the preceding paragraphs are incorporated by reference.

599.   Relator also brings this action on behalf of the State of Wisconsin, against Defendants under the State of Wisconsin False Claims for Medical Assistance Act, Wis. Stat. § 20.931(5)(a), for material misrepresentations, non-

disclosures, and other wrongful acts and omissions that occurred before the (non-retroactive) repeal of that law effective July 14, 2015.

600.   Defendants, through their material misrepresentations, non-disclosures, and other wrongful acts and omissions set forth above, violated each of the following provisions of the Wisconsin FCA, Wis. Stat. § 20.931(2), which created liability for any person who:

"(a)  Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance.

(b) Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance.

….

(g)  Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease any obligation to pay or transmit money or property to the Medical Assistance program."

601.   Pursuant to the Wisconsin FCA, based on Defendants' material misrepresentations, non-disclosures, and other wrongful acts and omissions set

forth above, Defendants are liable to the State for treble damages, civil penalties,

and all other relief authorized by law. Wis. Stat. § 20.931(2).

**COUNT XXXIX**

**California Insurance Frauds Prevention Act,
California Insurance Code § 1871.7(a) & (b)**

602. The allegations in the preceding paragraphs are incorporated by

reference.

603. Relator also brings this action for treble damages and penalties under

the California Insurance Frauds Prevention Act, Cal. Ins. § 1871.7, as amended

("CIFPA"). The CIFPA provides for civil recoveries against persons who violate

the provisions of the Act or the provisions of California Penal Code sections 549 or

550, including recovery of up to three times the amount of any fraudulent

insurance claims, and fines of between $5,000 and $10,000 for each such claim, as

may be amended. Cal. Ins. Code § 1871.7(b).

604. Subsection (e) of Cal. Ins. Code § 1871.7 provides for a qui tam civil

action in order to create incentives for private individuals who are aware of fraud

against insurers to help disclose and prosecute the fraud. Cal. Ins. Code §

1871.7(e). The qui tam provision was patterned after the Federal False Claims

Act, 31 U.S.C. §§ 3729-32, and the California False Claims Act, Cal. Gov't Code

§§12650 et seq.

164

605.   Subsection (b) of Cal Ins. Code § 1871.7 provides for civil recoveries against person who violate the provisions of Penal Code sections 549 or 550. Section 550 of the Penal Code prohibits certain activities, including violations of 550(a)(5)-(6), (b)(1), (2), and (3).

606.   By virtue of the acts described in this Complaint, Defendant caused to be presented, or knowingly assisted or conspired in presenting or causing to be presented, to the insurers in the State of California fraudulent claims that were induced by payments of kickbacks to physicians, in violation of Penal Code § 550 (b)(1), among other provisions.

607.   By virtue of the acts described in this Complaint, Defendants also concealed and/or failed to disclose information that would have affected the rights of pharmacies to receive reimbursement for prescriptions, in violations of Penal Code § 550(a).

608.   Each claim for reimbursement that was inflated as a result of Defendants' illegal practices represents a false or fraudulent record or statement, and a false or fraudulent claim for payment.

609.   Private insurers, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continue to pay the claims that would not be paid but for Defendants' unlawful conduct.

165

610.    The payment of the kickbacks alleged in this Complaint represents the inducement of health care benefits through a pattern and practice of fraudulent conduct and constitutes false claims within the meaning of Cal. Ins. Code § 1871.7(b) and Sections 549 & 550(a)(6) of the California Penal Code, among other provisions.

611.    Moreover, the payment of these kickbacks violates the "runners and cappers" provision of § 1871.7(a), as Defendants' kickback scheme was to "procure clients or patients to obtain services or benefits under a contract of insurance." In the alternative, Defendants' payment of kickbacks violated the "runners and cappers" § 1871.7(a), as Defendants' employment of sales representatives to provide kickbacks to physicians in order to generate prescriptions that would eventually be paid for by private insurance companies constitutes the unlawful and knowing employment of "runners, cappers, steerers, or other persons ... to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer." The Commissioner and Relator know and believe that these practices continued beyond the time at which she was employed at NGHCC, and upon information and belief, this pattern and practice continues to the present.

612.  The payment of the kickbacks alleged in this Complaint represents the inducement of health care benefits through a pattern and practice of fraudulent conduct and constitutes false claims within the meaning of Cal. Ins. Code § 1871.7(b) and Sections 549 & 550(a)(6) of the California Penal Code, among other provisions.

613.  Moreover, the payment of these kickbacks violates the "runners and cappers" provision of § 1871.7(a), as Defendants' kickback scheme was to "procure clients or patients to obtain services or benefits under a contract of insurance."  In the alternative, Defendants' payment of kickbacks violated the "runners and cappers" § 1871.7(a), as Defendants' employment of sales representatives to provide kickbacks to physicians in order to generate prescriptions that would eventually be paid for by private insurance companies constitutes the unlawful and knowing employment of "runners, cappers, steerers, or other persons ... to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer."  The Commissioner and Relator know and believe that these practices continued beyond the time at which she was employed at NGHCC, and upon information and belief, this pattern and practice continues to the present.

614.   The California State Government is entitled to receive three times the amount of each claim for compensation submitted in violation of Cal. Ins. Code § 1871.7.   Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged.

## COUNT XL

### Illinois Insurance Frauds Prevention Act
### 740 Ill. Comp. Stat § 92

615.   The allegations in the preceding paragraphs are incorporated by reference.

616.   Relator also brings this action for treble damages and penalties under the Illinois Claims Fraud Prevention Act, 740 Ill. Comp. Stat. § 92

617.   Subsection 5(b) of the Illinois Insurance Claims Fraud Prevention Act provides:   A person who violates any provision of this Act or Article 46 of the Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance.

618.   Article 46 of the Illinois Criminal Code, referenced in the above-quoted section, provides criminal penalties for any person who commits the offense of insurance fraud, defined in the statute as follows: (a) A person commits the offense

168

of insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company…. 720 Ill. Comp. Stat. §5/46-1(a).

619.   Subsection 15(a) of the Illinois Insurance Claims Fraud Prevention Act provides for a qui tam civil action in order to create incentives for private individuals to prosecute violations of the statute.   Subsection 15(a) provides: "An interested person, including an insurer, may bring a civil action for a violation of this Act for the person and for the State of Illinois.   The action shall be brought in the name of the State."   740 Ill. Comp. Stat. §92/15(a).

620.   By virtue of the conduct described in this Complaint, Defendants committed the following acts, or aided and abetted the commission of the following acts, in violation of the Illinois Insurance Claims Fraud Prevention Act: knowingly obtained, attempted to obtain, and caused to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim and by causing a false claim to be made on a policy of insurance issued by an insurance company, in violation of 740 Ill. Comp. Stat. §92/5(b) and 720 Ill. Comp. Stat §5/46-1(a).

621.   As a result of such conduct, Defendants have received illegal profits to which they were not entitled, at the expense of insurers and at the expense of the People of the State of Illinois, in substantial amount to be determined at trial.

622.   The Illinois State Government is entitled to receive three times the amount of each claim for compensation submitted by Defendants in violate of 740 Ill. Comp. Stat. § 92.  Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged in this Complaint.

## COUNT XLI

### Retaliation of Relator in Violation of False Claims Act
### 31 U.S.C. § 3730(h)

623.   The allegations in the preceding paragraphs are incorporated by reference.

624.   As alleged above, Relator engaged in lawful acts in furtherance of efforts to stop one or more violations of 31 U.S.C. § 3729.

625.   Because of Relator's lawful acts, Relator was subjected to retaliation by Defendnats in the terms and conditions of her employment at NGHCC.

626.   Defendants' retaliation against Relator was a violation of 31 U.S.C. § 3730(h).

627.   As a consequence of NGHCC's violation of 31 U.S.C. § 3730(h), Relator suffered damages.

170

WHEREFORE, Relator, on behalf of herself, the United States, and the States, prays:

 (a) That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of between $5,500 and $11,000 for each violation of the Federal False Claims Act before November 2, 2015, and $11,000 to $21,563 for each violation after November 2, 2015;

 (b) That the Court enter judgment against Defendants in favor of the States and the Relator in the amount of the damages sustained by the States, trebled as provided for in the State FCAs, plus civil penalties for each violation of each of the States' FCAs;

 (c) That Relator be awarded an amount that the Court decides is reasonable for recovering the proceeds of the action, including but not necessarily limited to the civil penalties and damages, on behalf of the United States, which, pursuant to the False Claims Act, shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the government intervenes and proceeds with the action, and not less than 25 percent nor more than

30 percent of the proceeds of the action or settlement of the claim if the government does not intervene;

(d)     That the Relator be awarded an amount from the proceeds of the action to the States as provided for in the *qui tam* provisions of each of the individual States' false claims acts;

(e)     That the Relator be awarded an amount from the proceeds of the action to the States of California and Illinois as provided for in the qui tam provisions of each individual States' California Insurance Fraud Prevention Act and the Illinois Insurance Claims Fraud Prevention Act.

(f)     That Relator receive all relief necessary to make Relator whole for Defendants' violation of 31 U.S.C. § 3730(h), including reinstatement, two times the amount of back-pay, interest on the back-pay, and compensation for special damages;

(g)     That judgment be entered against Defendants jointly and severally, in the amounts to be determined at trial; and

(h)     That Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(i)     That the Court order such other relief as is appropriate.

172

Trial by jury is hereby requested.

**RESPECTFULLY SUBMITTED THIS 28th day of June 2018:**

**FINCH MCCCRANIE, LLP**

*Michael A. Sullivan (by Eva Gunasekera, partner with permission)*

Michael A. Sullivan, Esq.
Georgia Bar No. 691431
Finch McCranie, LLP
225 Peachtree Street, NE
1700 South Tower
Atlanta, Georgia 30303
(404) 658-9070
(404) 688-0649 (fax)
msullivan@finchmccranie.com

Eva Gunasekera, Esq.
(*Pro Hac Vice* pending)
D.C. Bar No. 502542
Finch McCranie, LLP
225 Peachtree Street, NE
1700 South Tower
Atlanta, Georgia 30303
(202) 641-3804
(404) 688-0649 (fax)
eva@finchmccranie.com

Renée Brooker
(*Pro Hac Vice* pending)
D.C. Bar No. 430159
Finch McCranie, LLP
225 Peachtree Street, NE
1700 South Tower
Atlanta, Georgia 30303
(202) 288-1295
(404) 688-0649 (fax)
reneebrooker@finchmccranie.com

**Counsel for Plaintiff-Relator**

174